THE MAYOR AND COUNCIL OF THE CITY OF GRIFFIN *et a.l*, plaintiffs in error, *vs.* INMAN, SWANN & COMPANY, defendants in error.

1. An amendment, passed in 1859, to the charter of a city, granting to the mayor and council authority, on the recommendation of a majority of citizens, either in public meeting or by public election, to subscribe for the stock of railroads, to borrow money on the faith and credit of the city to pay the same, and to impose a special tax not exceeding one-half of one per cent. in any one year to meet such debt created, was not repealed by that provision in the constitution of 1868 which declares that "No law shall be passed by which a citizen shall be compelled, against his consent, directly or indirectly, to become a stockholder in, or contribute to, any railroad, * * except in the case of the inhabitants of a corporate town or city. In such cases, the general assembly may permit the corporate authorities to take such stock or make such contribution * *, after a majority of the qualified voters, of such town or city, voting at an election held for the purpose, shall have voted in favor of the same, but not otherwise." Another provision of the constitution expressly saves local acts passed for the benefit of cities and towns, not inconsistent with the supreme law nor with the constitution itself.

2. Construing the amended charter and the constitution together, and making them harmonize in spirit and meaning, the proper mode of taking the sense of the citizens, in 1871, on the question of subscribing for a given amount of stock in a certain railroad, was to order a public election by all the qualified voters of the city, with the privilege to each and every qualified voter to vote for or against the proposed subscription.

3. The votes of a majority voting at such election, though a majority of the whole number of qualified voters did not vote at all, were sufficient to warrant the mayor and council in making the subscription.

4. The authority to subscribe for stock, borrow money and impose future taxes, embraces an implied power to employ the usual and appropriate securities for engaging municipal credit in such cases, which securities are corporate bonds, bearing interest, and negotiable by delivery.

5. It was competent to deliver the bonds, at par, in payment of the subscription, in lieu of raising money upon them by loan and then paying the money in discharge of the subscription, the one mode being substantially the equivalent of the other, when consummated by consent of both contracting parties.

6. That certain conditions prescribed by an ordinance of the city, as preliminary to the right of the railroad company to receive the bonds, had been complied with, was determined affirmatively by the mayor and council, and such determination is binding in the present controversy.

7. The rule that the *bona fide* holder of negotiable securities is protected, applies in the present case, as to the face of the bonds and coupons.

Whether the stipulation indorsed thereon, expediting the time of payment in case of default in meeting an installment of interest, be operative or not, is not now here for decision.

8. In order for the jury to find that a contract made in another state and to be performed there, was void for usury, the evidence must show that the rate of interest agreed to be taken was in excess of the rate allowed by the law of such state, and to do this, evidence of the legal rate at the time and place of the contract is indispensable.

9. A contract between two corporations is not rendered void by the fact that some of the persons assisting to make the contract and taking part in the performance of conditions and in the acceptance of performance, were officers in both corporations and represented both to the extent of their respective powers.

10. The court is not bound to give effect to the written consent of counsel as to the order, or the time, of trying cases.

11. Where a case is called for trial in its order, and another case standing upon a different docket is tried with it, by consent, the plaintiff in the former case is entitled to open and conclude.

12. A rule of law so general as not to be practically useful at some point where the case presses before the jury, need not be given in charge.

Municipal corporation. Constitutional law. Railroads. Powers. Negotiable securities. Usury. Contracts. Practice in the Superior Court. Charge of court. Before Judge HALL. Spalding Superior Court. August Term, 1875.

Inman, Swann & Company brought assumpsit against the Mayor and Council of the city of Griffin, on forty-three bonds issued by said city to the Griffin, Monticello and Madison Railroad Company, aggregating in amount $21,500 00.

The defendant resisted a recovery, principally, on the following grounds: Said bonds were issued in payment of a subscription to the stock of said railroad company. They were illegally issued in this: By the 14th section of the act of December 13th, 1859, amending the charter of the city of Griffin, authority was given to the mayor and council, on the recommendation of a majority of the citizens, in public meeting or by public election, to subscribe to the stock of railroads, or such other internal improvements, as may be to the interest and advantage of the city of Griffin; to borrow money on the faith and credit of the city to pay the same, and to impose a special tax of not exceeding one-half of one per

cent. in any one year, to meet such debt thus created. On the 23d of May, 1871, said mayor and council passed a resolution authorizing the mayor to submit for the ratification or rejection of the legal voters of the city of Griffin, a proposition authorizing and requiring said mayor and council to subscribe $40,000 00 to the capital stock of said road, on such terms as they may deem for the best interest of said city, at a regular election, on a day to be fixed by said mayor, after giving legal notice thereof. James S. Boynton was then president of said railroad company and mayor of said city. As mayor, he ordered an election at the city hall, on the 29th of June, 1871, in which all legal voters of said city were requested to express their desire by casting their ballots at said election. The resolution did not authorize the mayor to submit the question to the citizens of Griffin as required by the charter, but to the legal voters. Under the charter, only such were legal voters as were of the age of twenty-one, and who had duly registered as legal voters. For the year 1871, there were registered as legal voters, three hundred and seventy-eight white voters, and three hundred and three colored voters, making six hundred and eighty-one, and only three hundred and two voters voted for subscription, and thirty-eight against it, making an aggregate of three hundred and forty votes polled at said election. On the 11th day of July, 1871, said mayor and council passed an ordinance authorizing the mayor to subscribe for four hundred shares of the stock of said company, and directing him to issue bonds in payment of the same in such sums as the directors of the railroad company may desire, payable one-eighth, respectively, in six, twelve, fifteen, twenty, twenty-three, twenty-five, twenty-seven and twenty-nine years, with interest at the rate of seven per cent., provided said bonds be received at their par value, and to be delivered to said company only on the following conditions :

1st. That all the shops and machinery of said railroad should be located in the said city of Griffin. 2d. That the construction of said road should begin at Griffin, and proceed

eastward, and that the said mayor and council would issue $2,000 00 in bonds for every mile graded and made ready for the iron, till said stock was paid for. 3d. That the city of Griffin should be the western terminus of said road. 4th. That said road should be so operated as to give the citizens of Griffin cheap and through freights. 5th. That none of the bonds should be delivered until the council should be satisfied that the road would be built.

The railroad enterprise did not command the confidence of the capitalist of said city, and said company became embarrassed for want of means and on account of a failure to collect subscriptions, and under these unfavorable circumstances, a resolution was offered in council authorizing the issuing of bonds of said city in payment of said subscription, utterly ignoring and disregarding all the conditions upon which said subscription was made by a former council, which passed by a vote of four yeas to three nays. G. A. Cunningham and T. J. Brooks, who were members of said council, voted yea; they were creditors of said road to a large extent and thereby disqualified to vote.

None of the conditions were complied with except that the work was commenced at the city of Griffin, but it was removed to the other end of the road soon after the bonds were delivered to the railroad company.

It was insisted on the part of defendant, 1st, that the amendment of 1859 to the charter was repealed by the provision in the constitution of 1868, recited in the first headnote; 2d. That if such repeal did not take place, then the submission should have been to the citizens, and not to the legal voters; 3d. That a majority of the legal voters did not vote at said election; 4th. That whilst the defendant may have had the power to subscribe to such stock, it had no authority to issue negotiable securities in payment therefor; 5th. That said bonds were delivered to the railroad company before the various conditions upon which the subscription to the stock was made, were complied with; 6th. That James S. Boynton was acting, at the time the subscription to the stock was made

and the bonds were issued, in the dual capacity of president of the railroad company and as mayor of the city.

No notice to the plaintiffs of any of the above alleged defects in the bonds was traced.

All of the aforesaid defenses were overruled and the defendant excepted.

Fifty bonds were issued on February 20th, 1872. On March 20th thereafter, the following resolution was passed by the mayor and council:

"WHEREAS, The interest of Griffin and her railroads are identical; and whereas the officers of the Griffin, Monticello and Madison Railroad are now negotiating far the speedy construction of said road; and whereas the city of Griffin intends in good faith and promptness to discharge all her obligations: Therefore, for the purpose of rendering to the officers of said road all the assistance that indemnity can afford in their negotiations:

"*Resolved*, That the mayor and treasurer be and they are hereby authorized and required to issue at once to the Griffin, Monticello and Madison Railroad Company, the balance of the bonds of said city to pay in full the $40,000 00 subscription made to said road, and that the following indorsement be printed upon the back of said bonds:

"*Resolved*, That in case of default of payment of any of the coupons of the within bond at the time of their maturity, then the bond itself to become due and payable, and it is hereby made a part of the contract in the issue of said bonds."

On April, 23d, following, it was resolved "that the foregoing resolution (last of the above) has reference to, and applies to, all the bonds issued to the Griffin, Monticello and Madison Railroad Company, and none other."

The provision incorporated in the above resolutions in reference to expediting the time of payment in case of default in meeting an installment of interest, was indorsed on the twenty-five bonds first issued, after their delivery to the company; on the remaining fifteen bonds, before. It was insisted by the defendant that such indorsement on the bonds first aforesaid, was void for want of consideration.

The evidence showed that the bonds were delivered by the defendant to J. H. Johnson, as the secretary and treasurer of the railroad company; that he transferred them to plaintiffs, who resides in New York, as his property, as collateral secu-

rity for money advanced to him; that the advance of money was made under a contract entered into at New York, and to be there performed; that he was to pay from twelve to thirteen per cent. per annum on the money thus advanced; that Johnson understood fully the circumstances under which the bonds were issued, as he was an active agent in procuring the subscription to the stock; that he was engaged in the banking business in the city of Griffin.

Before the commencement of the suit of plaintiffs, a bill had been filed by Keith and other tax-payers of the city of Griffin, against said mayor and council of the city of Griffin and the various holders of said bonds, to cancel the same upon substantially the same grounds as those upon which the above defense is based. After the commencement of such suit, the complainants filed an amendment, in which they stated the action of plaintiffs, prayed that further proceedings in that case might be enjoined, and that the entire controversy might be settled by the trial upon the bill. At the February term of the court, 1875, it was agreed between counsel that said equity cause, and other equity cases enjoined by it, should be continued and set down for trial on the first day of the August term, 1875. When the day agreed upon between counsel for the trial arrived, the court, over the objection of Keith *et al.,* called the common law case. An agreement was entered into to try the equity cause with it. The two cases were accordingly submitted together. The court ruled that the plaintiffs in the common law cause were entitled to the opening and conclusion of the argument. To this ruling Keith *et al.* excepted.

None of the bonds sued on were due, unless made so under the terms of the indorsement, on account of default in meeting the interest.

The jury found for Inman, Swann & Company the interest due on their bonds up to the time of the commencement of the suit. They found, in the equity cause, the bonds to be valid.

Keith *et al.* and the mayor and council of the city of Griffin

moved for a new trial upon the following, among other grounds, to-wit:

1st. Because the court erred in overruling the first six defenses to the common law action, as heretofore specified.

2d. Because the court erred in charging as follows: "If, therefore, the city had the authority to issue the bonds, then the fact that some of the city officials were officers of the railroad, does not, of itself, invalidate the bonds in the hands of anybody."

3d. Because the court erred in excluding testimony to show that the road was not in the condition required by the contract of subscription at the time the bonds were issued, on counsels' stating their inability to trace notice to plaintiffs.

4th. Because the verdict finding the bonds valid is contrary to the law and the evidence.

5th. Because the court erred in taking up the case of Inman, Swann & Company *vs.* the mayor and council, prior to the equity case of Keith *et al. vs.* said mayor and council *et al.*, as agreed upon by counsel in the latter case.

6th. Because the court erred in allowing to counsel for Inman, Swann & Company, the opening and conclusion of the argument of the two cases jointly submitted to the jury.

The motion was overruled, and Keith *et al.*, and the mayor and council of the city of Griffin, excepted.

SPEER & STEWART; HUNT & JOHNSON; D. N. MARTIN, for plaintiffs in error.

BECK & BEEKS; BOYNTON & DISMUKE, for defendants.

BLECKLEY, Judge.

The city charter provided for subscription by the mayor and council, "on the recommendation of a majority of citizens, either in public meeting or by public election." As election is designated as one of the modes of making the recommendation, the citizens contemplated in the charter are probably those qualified to vote. The general source of au-

The Mayor, etc., of Griffin *et al. vs.* Inman, Swann & Company.

thority for such subscriptions, which the constitution ordains, is "a majority of the qualified voters of such town or city, voting at an election held for the purpose?" Leaving out the question whether the action of any number of citizens "in public meeting" could be recognized, we think the charter and the constitution are near enough alike, in their provisions touching elections, for the former not to be wholly repealed by the latter. We are not sure that a repeal would be wrought if they were more unlike than they are, as the constitution, in the provision from which we have quoted, seems to intend a limitation upon future legislation, and not the abrogation of prior enactments. If the charter, in the use of the loose term "citizens," be construed to mean all the citizens, whether qualified to vote or not, and if the constitution be retroactive and in conflict with it, the result would be, not a repeal, but a modification of the charter. The terms, "a majority of citizens," as found in the charter, would thus be cut down and restricted to "a majority of the qualified voters, * * voting at an election held for the purpose." Looking to the provisions of both instruments, construing them together, and applying the spirit of the constitution, we think the proper mode of administering the charter, at an election held in 1871, was to give all the qualified voters, and none others, an opportunity to vote. This was done. It appears that a majority of those entitled to vote did not take part in the election; but this, we think, made no difference. The general rule as to popular elections is, that those who abstain from exercising the franchise are not regarded in declaring the result. By staying away from the polls, they virtually agree to abide by the will of a majority of those who attend and vote. This is the rule expressly established by the constitution for the class of elections which we are now considering: Only "a majority of the qualified voters * * *voting*," is required to authorize subscription: See 52 *Georgia Reports*, 621.

For other points ruled in the case, read the syllabus together with the reporter's statement.

Judgment affirmed.