WELLS *et al. v.* RAGSDALE, ordinary.

</div>

1. According to the provisions of paragraph 4, section 1, article 2 of the constitution of this State ( Civil Code, § 5927), it is requisite only that two thirds of the qualified voters of a county, who may have voted at an election held for that purpose, should vote in favor of the removal of a county-site, in order to authorize such removal. The act of the General Assembly approved October 8, 1879 ( Civil Code, § 394), provides that the assent of two thirds of the qualified voters of the county shall be necessary to authorize such removal. Inasmuch as the act referred to imposes upon the right and power of removal conditions other than those expressed in the constitutional provision above mentioned, and requires a greater number of votes in order to authorize such removal, such act is to that extent unconstitutional and void.

2. The constitutional provision above referred to, in so far as the same prescribes the method of ascertaining the number of votes necessary to a change of a county-site, differs from those other provisions of the constitution bearing upon the right of counties to incur debts, etc., in that, in the former the exercise of the privilege is dependent upon the assent of *two thirds of the qualified voters voting at the election,* and in the latter, upon the assent of *two thirds of the qualified voters of such county.*

3. Under the provisions of section 391 of the Civil Code, the power to call an election to determine whether in a given county there shall be a change of the location of the county-site is vested in the ordinary; and even if the General Assembly had power in a given case to so change this general law as to vest this power in another official, the act approved December 8, 1886, creating a board of commissioners of roads and revenues for the county of DeKalb, neither vested nor sought to vest such power in the board of commissioners created by it.

4. In holding such an election, it is necessary not only that the voter voting for the removal of the county-site should state upon his ballot "for removal," but also that he should designate thereon the particular place to which he desires the county-site removed.

5. To the validity of such an election it is not indispensable that the polls should be opened at each of the polling-places in the county.

6. Where in a given case the correctness of the result of such an election is called in question, an admission made in the pleadings that certain of the voters, voting at such election, voted in favor of the removal of the county-site to a particular place, so long as it stands as a part of the pleadings, is binding upon the party making it, and the court is neither required nor authorized to inspect the several ballots to which such admission relates, in order to ascertain whether the facts thus admitted are true.

7. Where an election to determine upon the change of a county-site was regularly ordered by the proper authority, and in pursuance of such order an election was held which resulted in favor of a removal of the county-site by the requisite majority of the qualified voters voting at such election, and, notwithstanding such vote, the ordinary, before the General Assembly shall have had an opportunity to consider whether the necessary election has been held and whether it will authorize a removal of such county-site, is proceeding, at great expense to the public, to erect a new court-house at the place from which it was sought to remove such county-site, a court of equity, at the suit of taxpayers of such county, will enjoin the contemplated appropriation of public money necessary to the construction of such court-house; and in passing upon the question as to whether it will exercise such jurisdiction, it will not look behind the returns of such election to determine whether or not irregularities occurred in the conduct of such election, and to what extent such irregularities, if any existed, may have contributed to the actual result.

Argued June 29–30, — Decided July 27, 1897.

Petition for injunction. Before Judge Candler. DeKalb county. May 22, 1897.

*Glenn & Rountree* and *John A. Wimpy*, for plaintiffs.

*Candler & Thomson, J. H. Green* and *W. W. Braswell*, for defendant.

LITTLE, J. 1. The questions which arise in this case are in relation to the change of the county-site from the town of Decatur to the town of Stone Mountain, in DeKalb county. Wells and other citizens filed a petition in which they prayed for an injunction to restrain the ordinary from opening or accepting any bid for the erection of a new court-house in the town of Decatur, he having advertised for such bids. They also prayed that he be enjoined from paying out any money

or taking other steps toward the erection of such court-house.
The petitioners allege that an election was held, under the re-
quirements of the statute, on the 2d of December, 1896, and
that a majority of the voters voting at such election voted for
a change of the county-site to the town of Stone Mountain.
It appears from the record, that on a proper petition the ordi-
nary ordered an election for the change of county-site from
Decatur to Stone Mountain, to be held on December 2d; on
that date an election was so held; the polls were opened at
twelve precincts in the county; the total number of votes cast
was 974, and of this number 814 were for removal.   The or-
dinary, against whom this petition was filed, demurred on cer-
tain grounds, and set up that at the time the petition for the
election was presented and the order therefor passed, there was
in existence for the county a board of commissioners of roads
and revenues, who had exclusive jurisdiction and control of
all the property of the county and of the levying of taxes,
with authority to exercise all the powers that could have been
exercised by the inferior court when sitting for county pur-
poses, or by the justices thereof, at the time of the abolish-
ment of said court, except as to proceedings not material to
be set out; that the polls were not opened at four designated
precincts in said county; that the election was irregular in
other respects, etc.   The main and controlling ground, how-
ever, upon which the case is to be decided, as insisted on in
this court, is, that two thirds of the qualified voters of De-
Kalb county were required to vote for the change of a county-
site under the constitution and laws of this State, before the
same would be an authoritative expression of the voters of
said county, and require the certificate of the secretary of
State to be made to the General Assembly concerning the ac-
tion taken by the voters.   By reference to paragraph 4, sec-
tion 1, article 11 of the constitution of this State, it will be
seen that it is therein provided that no county-site shall be
changed or removed except by a two-thirds vote of the quali-
fied voters of the county voting at an election held for that
purpose, and a two-thirds vote· of the General Assembly.
Thus it is required, not only that a given number of the

qualified voters of the county shall give expression to a desire
for a change of the county-site, but that the General Assembly,
representing the State which has an interest in the location of
the county-site of each county, shall, in the discharge of the
duties resting upon them, consent to such a change by a vote
of two thirds of each branch.   No question was raised as to
the fact that an election was ordered by the ordinary of the
county, and that it was held on the designated date.   An ob-
jection was made that the election should have been called by
the board of commissioners of roads and revenues of DeKalb
county, instead of the ordinary, which will be hereafter con-
sidered.   In the answer filed to the petition the point is dis-
tinctly made that such removal was not authorized by two
thirds of the qualified voters of the county.   The act of the
General Assembly, which purported to carry into effect the
constitutional provision on this subject, in the fourth section
declares, that the certificate of the secretary of State, show-
ing that said election was held and that two thirds "of the
qualified voters of said county, as indicated by the tax
digest," voted at such election in favor of removal, shall be
sufficient evidence of the holding of said election and the
number of votes cast.   Acts 1878–9, p. 45.   Political Code,
§ 394.   The language used in this section is different from
that in the constitutional provision to which we have referred.
In the latter, a county-site is authorized to be changed, so far
as the voters can authorize it, by "a two-thirds vote of the
qualified voters voting at an election held for that purpose."
Codified in sections 391–394 of the Political Code, the act is
somewhat inconsistent in its terms.   By section 393 it pro-
vides, "and if two thirds of the votes cast at said election are
in favor of removal to any one particular place, the General
Assembly next convening after said election may provide for
the removal of the county-site."   But by section 394 it is pro-
vided, that sufficient evidence of the holding of the election
and the number of votes cast shall be had in the certificate of
the secretary of State, showing that the election was held and
that two thirds of the qualified voters of the county, "as indi-
cated by the tax digest," voted at such election in favor of re-

moval. It would seem, therefore, that section 393 contemplated that "two thirds of the votes cast at the election" would authorize the removal, while section 394 contemplated that the necessary two thirds to authorize the removal must be two thirds of the voters as shown by the tax digest of the county. The removal or change of the county-site is in fact made by the General Assembly, and by provision enacted for that purpose; but as we have seen, before the General Assembly can authorize or provide for such removal, two thirds of the qualified voters of the county, voting at an election held for that purpose, must express *their* wish for a removal; the wish of such a number of the people of the county is a condition precedent to action by the General Assembly. There is, therefore, a conflict between the constitutional provision and the terms of the act codified in section 394 as above mentioned. Our attention has been called to the provisions of the constitution, paragraph 1, section 7, article 7, which declares that no debt hereafter incurred by any county, etc., shall exceed a given rate per centum, without the assent of two thirds of the qualified voters thereof at an election held for that purpose; and the defendants to the petition in the case before us insist that the constitutional provision in relation to the removal of county-sites is to be governed by the same rule. The answer to this is, that the words and meaning of the two sections of the constitution are different. In that relating to the making of a debt, the assent of two thirds of the qualified voters of the county is required. By that provision which authorizes a change of county-site, two thirds of the qualified voters of the county voting at an election held for that purpose is all that is requisite. In the first instance it is required that two thirds of the qualified voters of the county shall assent to the proposition, and provision has been made by law by which the number of qualified voters of a county may be ascertained; and unless this constitutional provision has been complied with, tested by the plan which has been inaugurated to ascertain the whole number of the qualified voters, the election has been held not to authorize the creation of the debt. In the case of *Mayor of Madison* v. *Wade*, 88 *Ga.* 699, it was held that, in

the absence of a proper registration act to ascertain the number. of the qualified voters in the town of Madison, it should appear that two thirds of the entire number of such voters voted for the same, and that unless it did so appear, the mere fact that two thirds of such voters voting at an election held voted for the approval of a school act would not be sufficient to approve the act.   In the same case this court ruled that it was competent for the city, by passing a proper registration ordinance, to provide for ascertaining the whole number of such voters; and in the case of *Gavin* v. *City of Atlanta,* 86 *Ga.* 132, it was held, that whenever the legislature has provided for the registration of voters in a municipality, the number of voters registered therein is the true test in ascertaining whether the requisite two-thirds majority of the qualified votes has been obtained at an election for which the registration was provided, and that when the legislature has prescribed how the number of qualified voters shall be ascertained, the manner prescribed prevails, and not the common-law rule.   In the case of *Mayor & Council of Decatur* v. *Wilson,* 96 *Ga.* 251, it was held, that in the absence of any registration, it could not be lawfully ascertained whether or not two thirds of the qualified voters of the town had voted for public schools.   These cases are cited to show that this court has endeavored to give effect to the constitutional provisions which require, in several instances, the assent of two thirds of the qualified voters of a county or town to the validity of a particular act, and to show that when such constitutional provisions exist, the number of qualified voters necessary to assent to the act is not to be determined by the number of votes cast at such election.   An election is not necessarily invalid because less than a given number of voters participated.   On the contrary, where there is no restriction as to the number of votes necessary to carry or adopt a particular measure, and an election has been regularly ordered and held under the law, a majority of those voting at such election determines the result.   But when the assent of a given percentage of the electors is required to determine any result in the affirmative, it must appear that the given number have voted in favor of the measure at the election held.   Where the con-

stitution of North Carolina prohibited counties and cities from incurring debts except upon a vote of a majority of the qualified voters therein, it was held by the Supreme Court of North Carolina that "the qualified voters" refers to the class of persons whose competency to vote has been passed upon in their admission to registration, and that such persons as have been lawfully registered constitute the qualified voters of a given county; and it was further held that a mere majority of the votes actually cast in that case was not sufficient. 96 N. C. 514. Of like import see 95 Mo. 44; 72 N. C. 486; 50 Miss. 736; 54 Mo. 391; 11 Ill. 478. It will thus be seen, that where the approval of an act or measure is required to be had by a given number of the qualified voters of a county or town, before such act or measure can be declared passed, it must affirmatively appear that the qualified voters have been ascertained and that the requisite number voted therefor; otherwise, it has not been ratified. The language of the constitutional provision which we are now considering is not that the county-site shall be changed or removed by a two-thirds vote of the qualified voters of the county, but of such qualified voters voting at an election for that purpose; that is, it is only essential in order to authorize a removal that two thirds of the qualified voters of the county who shall vote at such election shall cast their ballots in favor of removal. When a statute requires a question to be decided by the votes of a majority of the voters of a county, this does not require that a majority of all persons in the county entitled to vote shall actually vote in the affirmative, but only that the result shall be decided by a majority of the votes cast. In such a case, the proper test of the number of persons entitled to vote is the result of the election as determined by the ballot-box, and the courts will not go outside of that to inquire whether there were other persons entitled to vote who did not do so. McCrary on Elections, § 208. The voters of the county, when such are designated in the statute, are necessarily the voters who vote at the election, since the result in each case must be determined by a count of the ballots cast, and not by an inquiry as to the number not cast. 20 Ill. 163; 1 Sneed, 692; 15 Conn. 475;.

9 B. Monroe, 526; 37 Mo. 270; 16 Wallace, 644. And in 5 Otto, 369, it was held that all qualified voters who absent themselves from an election duly called, are presumed to assent to the expressed will of the majority of those voting, unless the law providing for the election otherwise declares. The distinction therefore is plain, that when a two-thirds vote of the qualified voters of the county is required by law for any given action, two things must appear: first, the whole number of the qualified voters of the county must have been ascertained; and, second, that two thirds of such number voted in the affirmative. But where the provision is that a given measure may be passed by a two-thirds vote of the qualified voters of a county voting at an election held for that purpose, when it appears that two thirds of the whole number voting at such election assented to the measure submitted, it must be held to have been adopted.

The act of the General Assembly approved October 8, 1879, as codified, supra, wherein it is required that the certificate of the secretary of State shall be made showing that said election was held and that two thirds of the qualified voters of said county, *as indicated by the tax digest*, voted at said election in favor of removal, is in conflict with the provisions of the constitution now under review, and being so in conflict, that part of said act is unconstitutional and void, and the constitutional provision has been met when the certificate of the secretary of State shows that the election was held, and that two thirds of the qualified voters of the county voting at an election held for that purpose voted in favor of removal.

2. The difference between the constitutional provision now in question, in so far as the same prescribes the method of ascertaining the number of votes necessary to a change of county-site, and those other provisions bearing upon the right of counties to incur debts, etc., has been referred to in our reasoning above, and the matter of difference pointed out.

3. It was further urged in the demurrer and answer of the ordinary to the petition filed in this case, that the power to call an election to determine whether there shall be a change of the location of the county-site is by law vested in the board

of commissioners of roads and revenues of DeKalb county. The act of the General Assembly, to which we have referred heretofore, distinctly declares that the petition for the election shall be made to the ordinary of the county where the removal or change of county-site is desired. It further provides that the ordinary shall pass an order directing the election to be held. It is urged, however, that an act approved December 8, 1886 (Acts 1886, p. 259), creating a board of commissioners of roads and revenues for the county of DeKalb, imposes this duty on such board, and that under the terms of that act the ordinary has no jurisdiction to order the election. To this we can not assent. In the first place, the act of 1879 vests such power and duty in the ordinary; and it is perfectly competent for the legislature to give to this officer such additional duties as it may see proper to impose, and in the act he is expressly named. In addition thereto, nothing appears in the act of 1886 which in words or by necessary implication would devolve duties of this character upon the board of commissioners of roads and revenues. Their powers are distinct and well defined, and there is no conflict in the exercise of the powers conferred by that act and those which the law imposes upon the ordinary.

4. It will be noted that under section 3 of the act of 1879, in relation to changing county-sites, it is required that all voters in favor of removal, and to what place, shall indorse on their ballots "for removal," and those opposed to removal shall indorse on their ballots "against removal"; and if it should appear that the votes cast at such election are in favor of removal to any one particular place, the General Assembly next convening after said election may provide for the removal of said county-site by appropriate legislation. The meaning and intention of this provision of the act is not complied with by a simple indorsement upon the ballot of the voter "for removal." It must go further and express the wishes of the voter as to the place to which the county-site shall be removed; and unless such expression is made, such vote can not be counted for removal. The requirement of the act is met when on consolidation of the votes it appears that two thirds of the votes cast

are in favor of removal to a particular place, and it is only in that event that the General Assembly can provide for a removal of the county-site to the place so selected.

5. It was argued in the demurrer and answer in this case, that the polls were not opened at such election in all of the polling-places of the county. This is not necessary. If the election was duly and fairly called and the notice as prescribed by law given, if sufficient interest in the result was not manifested by opening the polls and holding the election at particular precincts, and such election was held in other precincts of the county, the result will not be changed or set aside because of a failure to open the polls at particular places. As we have seen, the law has been met by the assent of two thirds of those who participated in such election.

6. In this case the correctness of the result of the election is called in question by the answer of the defendant. In such answer is set out the number of voters voting for the removal of the county-site of DeKalb county to Stone Mountain, and the number of voters voting against such removal. Under the rules of pleading, such statement is taken as an admission that the voters voting for removal voted for such removal to the town of Stone Mountain, and is binding upon the defendant; and the court is neither required nor authorized, in view of such admission, to inspect the several ballots cast, in order to ascertain the truth of the admission so made.

7. The petition is exhibited in this case to restrain the ordinary of DeKalb county from opening and accepting bids to erect a new court-house in the town of Decatur. The election which was held on the question of the removal seems to have been treated as invalid and of no effect, and the ordinary advertised for bids to erect a new court-house at the present county-site. The removal can not be made, under the terms of the act to which we have several times heretofore referred, without the concurrence of the qualified voters of the county of DeKalb and of the General Assembly. It is entirely competent for the General Assembly to give expression to the wishes of the voters of DeKalb, or not, as it may deem best. There is nothing obligatory on that body so to do, and the

mere fact that the voters of the county have expressed a desire for removal can have no other than a moral effect upon the General Assembly. The provisions of the law, however, are that the election shall be held, and returns made as provided by law for members of the General Assembly, and the certificate of the secretary of State is sufficient evidence of the holding of the election and number of votes cast. The matter of removal then rests with the General Assembly, and a two-thirds vote of that body is required to effect the change. In this case the preliminary step has been taken, and under the law, aided by the admissions in the pleadings, it appears that a proper and legal election has been held. The requisite majority of the voters of the county have indicated their desire for the removal of the county-site to Stone Mountain, and the only remaining step to accomplish such change is that the General Assembly, by a two-thirds vote, shall so provide. Pending the action of the General Assembly, should the ordinary be enjoined from letting a contract for the erection of a new court-house at the present county-site? Should he do so, necessarily an expenditure of a large amount of money will be required. If the General Assembly shall authorize the removal, then this expenditure would be a loss to the taxpayers of the county. The money in hand, as shown by the answer of the ordinary, was raised and must be devoted to the erection of this new building for the county. It ought to be erected at the place authorized by law. The ordinary can not anticipate what the action of the legislature will be in this respect; and until the question is passed upon by that body, the money ought not to be expended at all. When the legislature shall have spoken, the county-site of DeKalb county will have been fixed by law; and inasmuch as the preliminary proceedings have been instituted and the removal sanctioned by the voters of the county, there ought to be no expenditure until the result of the election is finally settled. Otherwise, a new levy of taxes might be required to provide the county with a public building. It is therefore our judgment, and we so rule, that the court erred in refusing to grant the injunction prayed for in this case; and the

*Judgment is reversed. All the Justices concurring.*