## LEE *et al. v.* TUCKER *et al.*

1. The statute requires a petition for the removal or change ·of a county site to be signed by two fifths of the poll-tax payers, as shown by the tax-receiver's digest last made out. Pol. Code, § 391. The county of Ben Hill was formed partly from territory taken from Irwin county. which included two militia districts in their entirety. · A petition to remove the county site of Irwin county, filed after the formation of Ben Hill county, but before the tax-receiver of Irwin county had compiled a new digest, sufficiently complies with the statute if it contains the signatures of two fifths of the poll-tax payers on the ˙tax-receiver's digest of Irwin county last made out, after deducting therefrom the names of the poll-tax payers of the transferred militia districts.

2. When the right to enact a law depends upon the existence of facts, it is to be presumed that the legislature investigated and was satisfied that the facts did exist before enacting the law.   A provision in a general act, that in a given case the certificate of a certain public officer "shall be sufficient evidence" of the existence of· facts prerequisite to the legislation, does not necessarily preclude the legislature from ascertaining by other appropriate means the existence of such facts.   When the journals of the General Assembly˳show nothing to the contrary, the existence of the facts which are a necessary preliminary to the particular legislation can not be inquired into by the judicial department of the government.

3. The act of 1879 (Pol. Code, §§ 391-394) does not fall because of its conflict with the constitution as to the number of votes required to remove or change a county site.   The sole purpose of the act was to pro-

viac machinery to carry out the constitutional provision relative to a change of county sites by providing an election. By striking out its requirement as to the necessary number of votes, which was already fixed by the constitution, the act remains complete in itself and capable of being carried out in accordance with the legislative intent.

4. Where the title of an act is "An act to change the county site of Irwin county, in the State of Georgia, from Irwinville, in said county, to Ocilla, in said county," and in the body of the act it is declared that the county site be changed from "the town of Irwinville" to "the town of Ocilla," the act is not void because Ocilla was incorporated as a city and not as a town at the time of its passage by the General Assembly. The essential element is the identity of place. and this is clear and convincing from the act.

Argued November 19, 1907.—Decided January 31. 1908.

Petition for injunction. Before Judge Whipple. Irwin superior court. October 4, 1907.

*Hal Lawson,* for plaintiffs.

*McDonald & Quincey* and *H. E. Oxford,* for defendants.

EVANS, P. J. J. M. Lee and others as citizens and taxpayers of Irwin county filed an equitable petition against Tucker and Fletcher, commissioners of roads and revenue of Irwin county, seeking to enjoin them from removing the court-house from Irwinville to Ocilla, upon the grounds that the election to determine whether the county site should be removed was illegal and void, and the act of the legislature authorizing the removal was unconstitutional, null, and void. The following facts appear from the evidence: By a constitutional amendment duly passed and ratified in 1906 the county of Ben Hill was created out of territory formerly embraced in the counties of Irwin and Wilcox. Two entire militia districts and portions of three others were taken from the territory of Irwin county. On April 29, 1907, a petition was presented to the ordinary of Irwin county, requesting that an election be called for the purpose of submitting to the voters of Irwin county the question of removing the county site from Irwinville, signed by two fifths of the poll-tax payers of Irwin county, as shown by the tax digest of Irwin county for 1906, excluding the two districts that had been changed to Ben Hill county in their entirety. In arriving at the conclusion that two fifths of the poll-tax payers had signed the petition for an election, the ordinary used the tax digest of 1906, which included the names of the poll-tax payers included in that portion of Irwin county

which, at the time the petition was filed, was included within the territory of Ben Hill county. The names of those poll-tax payers included in the two districts which were entirely cut off into Ben Hill county, as shown by the digest, were not considered in determining whether the requisite number of signatures had been secured to the petition, but only the names of such poll-tax payers as were included in the remaining portions of Irwin county, and in the three districts which were partly in Irwin and partly in Ben Hill counties. The election was ordered to be held on June 12, 1907; and the returns of this election showed that two thirds of those voting thereat favored the removal of the county site from Irwinville to Ocilla. The election was contested under the provisions of the act of 1897, and on August 16, the secretary of State rendered his decision finding that more than two thirds of the votes legally cast at the election were in favor of the removal of the county site from Irwinville to Ocilla. The journals of the House and Senate showed that the bill entitled "An act to change the county site of Irwin county, in the State of Georgia, from Irwinville, in said county, to Ocilla, in said county, and for other purposes," was introduced in the Senate and read for the first time on July 16, 1907, for the second time on July 17, and for the third time on August 8, when it was duly passed by a vote of 39 for and 1 against the bill. The bill was referred to the House and read for the first time on August 9, for the second time on August 10, and for the third time on August 17, when it was duly passed by a vote of 140 for and 10 against the bill. On the hearing the judge refused the injunction, and plaintiffs excepted.

1. It is contended that the election of June 12, 1907, was illegally called, because two fifths of the qualified voters (as shown by the tax-receiver's digest last made out) of Irwin county had not signed the petition for removal. The tax digest used in the present instance was that for Irwin county for 1906. The petition was filed on April 29, 1907, before the tax digest for that year had been prepared. The legislature in July, 1906, passed an act amending the constitution, whereby Ben Hill county was created, which amendment was duly ratified during the fall of 1906. A considerable portion of the territory of Ben Hill county was taken from Irwin county, including two entire militia districts; and in determining the question as to whether two fifths of the poll-tax pay-

ers of Irwin county as shown by the tax digest last made out had signed the petition for the election, the ordinary did not consider the names of those poll-tax payers on the digest whose place of residence appeared from the digest to be within the territorial limits of the two militia districts included in their entirety in the new county of Ben Hill. Surely only poll-tax payers of Irwin county were entitled to petition for an election to change the county site of Irwin county. It was no longer a matter of concern to former citizens of that county, who had been transferred to the new county, whether its county site was changed or not. If these quondam residents of Irwin county, who had been thus transferred into the new county of Ben Hill, were to be considered in determining whether the required number had signed the petition, they would of necessity have had the right to sign the petition. If this were true, a case can easily be imagined where such former residents could either call or prevent an election in the county from which they had been transferred. The clear intendment of the statute is that none but resident poll-tax payers of the county shall be entitled to sign the petition, and only those resident poll-tax payers whose names appear upon the tax digest last made out. It does not mean that such tax-payers as have moved from the county since the digest was prepared, or who have been changed therefrom by constitutional amendment, shall be considered in determining whether a sufficient number have signed the petition, but it merely makes it a necessary prerequisite to the consideration of any poll-tax payer, for that purpose, that his name should have been on the tax-receiver's digest last made out.

2. The validity of the act approved August 19, 1907, changing the county site of Irwin county from Irwinville to Ocilla (Acts 1907, p. 307), was attacked, because the act was introduced, passed by the Senate, and read in the House the first and second time, before the secretary of State had made a finding upon the contest filed before him of the election of June 12, 1907. It is contended that the legislature was without legal power to take any step in the matter of the passage of this act till after the result of this contest had been certified to it by the secretary of State. In *Cutcher* v. *Crawford,* 105 *Ga.* 181 (31 S. E. 139), it was held that a certified transcript of the consolidated return of such an election, from the office of the secretary of State, was not admissible in

evidence for the purpose of showing that the General Assembly, in acting upon such a bill providing for such removal, did not have legal evidence showing such an election had been held, and the proper majority had voted for such removal. In that case the transcript showed that a proper majority had not voted for such removal; and it was said in the opinion in that case: "If such evidence were before it, we are bound to conclude that the same was not satisfactory, and that in some other way, or by some other means, it became convinced that two thirds of the legal voters voting at the election cast their ballots in favor of the removal." The act in the present case recites (after stating in detail the various steps leading up to the election) that "at said election so held two thirds of the legal votes cast at said election were in favor of the removal." The returns of the election, and the finding of the secretary of State, subsequent to the introduction but prior to the final passage of the bill, show that this was true. The constitution provides that no county site shall be changed "except by a two-thirds vote of the qualified voters of the county, voting at an election held for that purpose, and a two-thirds vote of the General Assembly." Civil Code, § 5927. By an act approved October 8, 1879 (Acts 1878-9, p. 44), now embraced in the Political Code, §§ 391-394, the legislature provided for holding an election to determine whether two thirds of the voters of a county desired such a change, and further provided that "the General Assembly next convening after said election may provide for the removal of said county site by appropriate legislation." A section of this act provides that the certificate of the secretary of State showing that the election was held, and that two thirds of the qualified voters thereat favored removal, "*shall be sufficient evidence* of the holding of said election and the number of votes cast." But the mere fact that such certificate shall be sufficient ·evidence is in no sense a declaration that it shall be the only evidence of such fact. In fact it is entirely optional with the legislature whether it will pass such a bill, even where there has been an election authorizing it; and the fact that it has such a. discretion would indicate that it would be entirely proper for the legislature to make a full investigation of the circumstances of the election, and no .limit whatever is suggested upon their power to do so, or as to the scope of their investigation. It is a matter of

legislative history that it has not felt bound to follow the result of such an election, nor, as will be seen from the *Cutcher* case, supra, has the General Assembly refrained from passing an act to change a county site in spite of the fact that the certificate of the secretary of State showed that a sufficient number of votes favoring such change had not been cast at such election. In the present case the evidence fails to show that the journals of either house contained any statement of how notice of the result of the election was received by the legislature, but it was sought to establish a lack of such information on the part of the legislature here, as in the *Cutcher* case, by a certificate of the secretary of State. Nor is the law changed in this regard by the act approved November 9, 1897 (Acts 1897, p. 87), providing for a contest of such elections before the secretary of State. In the 8th paragraph of the first section of this act it is provided that the secretary of State "shall keep on file and preserve all the papers in such contested cases, and transmit the same to the General Assembly when required." Nothing is there said which indicates that the legislature is in any way bound by his finding, and the provision that all the papers are to be kept on file, and transmitted to the General Assembly when required, would indicate that the legislature might pass upon the correctness of his finding from the papers of file, as well as by any other means it might see fit. As was said in the *Cutcher* case, supra, "It is not to be presumed that the General Assembly would have passed this act unless satisfied in some way that the proposal to remove the county site . . was in popular election carried by the requisite constitutional majority." It has been held by this court, with reference to the provision of the constitution requiring the publication of notice of the intention to ask local legislation, as a prerequisite to the passage of a local bill, that the question of the preliminary advertisement of such a bill is for determination by the General Assembly before passing the bill (*Speer* v. *Athens,* 85 *Ga.* 49 (11 S. E. 802, 9 L. R. A. 402; *Peed* v. *McCrary,* 94 *Ga.* 487 (21 S. E. 232)); and that "this court must presume that the requisite publication was made, unless the contrary appears from the journals of the legislature." *Chamlee* v. *Davis,* 115 *Ga.* 266, 271 (41 S. E. 691). In Stevenson v. Colgan, 91 Cal. 649 (21 Pac. 1090, 14 L. R. A. 459, 25 Am. St. R. 230), it was said: "When the right to enact a law

depends upon the existence of facts, it is the duty of the legislature before passing the bill, and of the Governor before approving it, to become satisfied in some appropriate way that the facts exist; and no authority is conferred upon the courts to hear evidence, and determine as a question of fact whether these co-ordinate departments of the State government have properly discharged such duty." See also Re Tipton, 28 Tex. App. 438 (13 S. W. 610, 8 L. R. A. 326). If, in Georgia, the courts have any such power to pass upon such a question of fact, it is at least clear from the rulings heretofore cited that they can consider no evidence outside of the journals of the two houses of the General Assembly; and unless they show affirmatively that the legislature acted in the face of or contrary to a constitutional prohibition, it will be conclusively presumed that it did not so act.

· 3. It is contended that the act providing for the removal of the county site from Irwinville to Ocilla is unconstitutional, because the constitutional provision that such removal may take place under certain conditions is not self-executing, and the act of 1879 providing for an election to determine the issue is unconstitutional and void in its entirety. The act of 1879 is alleged to be unconstitutional, because it is therein provided that the certificate of the secretary of State shall show that two thirds of the qualified voters of the county, "as indicated by the tax digest," voted in favor of removal, whereas the constitution requires that it shall be necessary for only two thirds of the voters voting at the election to vote in favor of removal. · It was held in *Wells* v. *Ragsdale*, 102 *Ga.* 53 (29 S. E. 165), that so much of the act of 1879 as required that two thirds of the number of voters, "as indicated by the tax digest," should signify their assent to a removal, is repugnant to the constitution and to that extent void, inasmuch as it imposes upon the right to removal conditions other than those expressed in the constitutional provision above mentioned, and requires a greater number of votes in order to authorize such removal. It was said in the opinion in that case, on page 60, that "the constitutional provision has been met when the certificate of the secretary of State shows that the election was held, and that two thirds of the qualified voters of the county voting at an election held for that purpose voted in favor of removal." It is contended that this unconstitutional provision is so connected with and in-

4

terwoven with the rest of the act that it is impossible to separate this portion from the other portions of the act. We can not agree with this contention. The sole purpose of the act of 1879 was to provide machinery to carry out the constitutional provision by providing for an election. The unconstitutional provision does not in any way affect any of the provisions for holding the election, nor its result. It merely relates to a certificate to be made by the secretary of State, based upon the returns of the election filed in his office. It requires that his certificate shall show, not only what the constitution requires as to such a result, but an additional fact imposing an additional condition which the constitution does not require. This certificate is merely evidentiary in character, and can in no° way affect the result of the election. It was said by Chief Justice Bleckley in *Irvin* v. *Gregory*, 86 *Ga.* 605 (13 S. E. 120), on page 614 of the opinion: "It is a well-established principle that unless the main purpose of a statute is affected by the unconstitutionality of a particular provision, the whole act is not thereby defeated." In McPherson *v.* Blacker, 146 U. S. 1 (13 Sup. Ct. 3, 36 L. ed. 869), it was held that a statute providing for the election of presidential electors, which conflicted with the act of Congress in that it fixed a different date for the electors to meet and give their vote, was not for that reason void. It was said on page 41 of the opinion: "Striking out the day for the meeting which had otherwise been determined by Congress, the act remains complete in itself, and capable of being carried out in acordance with the legislative intent." In Dunn *v.* Great Falls, 13 Mont. 58 (31 Pac. 1017), an act providing that cities of a certain class might incur a bonded indebtedness of four per cent. of their assessed value, though in conflict with the constitution, which only allowed such cities to become indebted three per cent., was held to be void only to the extent of the repugnancy. In English *v.* State, 31 Fla. 356 (12 So. 689), it was held that an act providing that every grand jury should consist of twelve persons was not rendered invalid by the insertion therein of an unconstitutional provision that the assent of eight of that number should be sufficient for the finding of an indictment. Black on Interpretation of Laws, 96, 97. In the present case the unconstitutional provision can be eliminated, and there will remain a complete, intelligible, and valid statute, which clearly carries out the legislative intent.

4. The ancillary petition attacked the act of 1907, providing for the removal of the court-house, on the ground that this "bill provides in the body thereof that the county site of Irwin county shall by said act be changed from the 'town of Irwinville' to the 'town of Ocilla,' and there is not within the limits of Irwin county such a municipal corporation as the town of Ocilla; but there is in the county the city of Ocilla." The title of the act was "An act to change the county site of Irwin county, in the State of Georgia, from Irwinville, in said county, to Ocilla, in said county, and for other purposes." In the body of the act Ocilla is referred to as the "town of Ocilla." The charter of the "town of Ocilla" was repealed by an act approved December 5, 1902 (Acts 1902, p. 524), and the town was incorporated as a city by an act approved December 17, 1902 (Acts 1902, p. 525). "A misdescription or misnomer in a statute will not vitiate the enactment or render it inoperative, provided the means of identifying the person or thing intended, apart from the erroneous description, are clear, certain, and convincing." Black on Interpretation of Laws, 80. In *Mayor of Smithville* v. *Dispensary Commrs.*, 125 *Ga.* 559 (54 S. E. 559), it is held that "the word 'town' is often used as a generic term, embracing cities as well as villages; and when the expression 'incorporated town' is used in an act of the legislature, it may include 'cities,' unless the contrary appears from the whole statute to have been the intent of the legislative body." In *Murphy* v. *Waycross*, 90 *Ga.* 36, (15 S. E. 817), practically the same question as is now presented was ruled upon. An act had been passed to authorize the establishment of a sewerage system for the "City of Waycross," whereas the government of that municipality was vested in the "Mayor and Council of the Town of Waycross." This act was upheld upon the ground that it clearly evidenced the intention of the legislature to make it applicable to that municipality. The title of the act in the present case states its object to be to remove the county site from Irwinville to Ocilla, and the use of the word "town" as applied to Ocilla can be treated as a generic term; but in any event the clear legislative intent is manifested by the provisions of the bill, and the mere misuse of the word "town" for "city" can in no event affect the validity of the act.

*Judgment affirmed. All the Justices concur.*