McKNIGHT *v.* CITY OF DECATUR *et al.*

No. 15412.    APRIL 4, 1946.

*Spalding, Sibley & Troutman, Harvey Hill,* and *Sumter M. Kelley,* for plaintiff.

*Eugene Cook, Attorney-General, Roy Leathers, Solicitor-General, B. Hugh Burgess,* and *R. A. McGraw, Assistant Attorney-General,* for defendants.

BELL, Chief Justice. ■ All of the steps taken in reference to these bonds occurred after August 13, 1945, this being the date on which the Governor of Georgia proclaimed as being effective the so-called "single amendment" to the Constitution of 1877, which was submitted to the voters of the State for ratification or rejection in the general election of August 7; and the city commissioners in declaring the result of the bond election undertook to apply the provision relating to the subject as contained in such "amendment." One of the intervenor's objections was that the "amendment" of 1945 never became effective and is wholly void, because it contained numerous amendments embodying distinct and unrelated matters, and its submission to the voters as one amendment was therefore in violation of the provision of the Constitution of 1877, that, "When more than one amendment is submitted at the same time they shall be so submitted as to enable the electors to vote on each amendment separately." Code, § 2-8601. On this hypothesis, it was contended that the validity of the bonds should be determined by the Constitution of 1877, as amended in 1918, under which, if it should be applied, none of the several classes of bonds received the assent of the requisite proportion of the qualified voters of the municipality. Code, § 2-5501.

A similar question as to the validity of the so-called amendment of 1945 was presented in the case of *Wheeler* v. *Board of Trustees of Fargo Consolidated School District,* supra; and in that case we held that this instrument, though referred to by its own terms as an "amendment," is really not an amendment to the Constitution of 1877, but is a completely revised or new Constitution, and is valid.

We also have in this case substantially the same questions that we had in the *Wheeler* case, as to disqualification of the members of this court to pass upon the validity of such instrument. We then held that, under the rule of necessity as there discussed, all of the Justices, except Justice Candler, were under an imperative duty to preside, since, unless we did so, no court could be lawfully assembled to decide the case. The same rule applies here, except that, in view of the rulings upon the merits as made in that case, Justice Candler considers it his duty to preside in the instant case, and in this view the other Justices concur.

It may be noted that the so-called amendment of 1945 itself declared that, "If a majority of those voting vote for the amendment revising the Constitution when the results are certified to the Governor, he shall proclaim the amendment revising the Constitution of 1877 as the revised Constitution of Georgia." Ga. L. 1945, p. 89.

For the reasons stated in the *Wheeler* case, we reaffirm the conclusion there reached as to the validity of such constitution.

■ The intervenor objected further upon the ground that none of the bonds received the necessary vote, even under the terms of the revised Constitution, to wit, "without the assent of a majority of the qualified voters of the county, municipality, or other political subdivision voting in an election for that purpose to be held as prescribed by law." Art. 7, sec. 7, par. 1 (Ga. L. 1945, p. 69). This contention calls for a construction of the quoted clause as applied to the facts.

As we have seen, each of the proposed bond issues was approved by a majority of those who voted, but not by a majority of all of the qualified voters of the municipality; nor did a majority of all of such voters participate in the election, as to any of the proposed issues.

This court has heretofore considered the corresponding provisions of (1) the Constitution of 1868, (2) the original Constitution of 1877, and (3) the Constitution of 1877 as amended in 1918.

The Constitution of 1868 provided that the General Assembly might permit the corporate authorities of any town, or city, to take stock in, or contribute to, any railroad, or work of public improvement, or engage in such work, "after a majority of the qualified voters of such town or city, voting at an election held

for the purpose, shall have voted in favor of the same; but not otherwise." Code of 1873, § 5067. In *Black* v. *Cohen*, 52 *Ga.* 621 (8), 628, this court speaking of that provision, said: "The question is, whether the Constitution requires that a majority of *all* the qualified voters of a town or city should vote upon the question submitted, or whether a majority of those *voting* at the election is sufficient. In our judgment, the Constitution only requires ·a majority of those *voting* at the election. Such are the plain words of it, and doubtless that was its true intent and meaning; otherwise it would have said a majority of *all* of the qualified voters of such town or city, instead of saying, after a majority of the qualified voters of such town or city *voting* at an election held for the purpose. Every qualified voter in the City of Rome had the privilege of voting upon the question, at the time the election was held, or not voting, just as he pleased, and if he did not vote when he had the opportunity to do so, the presumption is that he was willing to abide the decision of those who did vote." In *Mayor &c. of Griffin* v. *Inman, Swann & Co.,* 57 *Ga.* 370, 377, this court, referring again to the same provision, said: "It appears that a majority of those entitled to vote did not take part in the election; but this, we think, makes no difference. The general rule as to popular elections is, that those who abstain from exercising the franchise are not regarded in declaring the results. By staying away from the polls, they virtually agree to abide by the will of the majority of those who attend and vote. This is the rule expressly established by the Constitution for the class of elections which we are now considering: Only 'a majority of the qualified voters . . voting,' is required to authorize .the subscription."

It thus appears that, under the Constitution of 1868, we had the word "voting," just as we have now, and it was held, in effect, that only a majority of the qualified voters who participated in an election was required.

The original Constitution of 1877 contained the language, "without the assent of two thirds of the qualified voters thereof, at an election for that purpose." Code of 1886, § 5191; Code of 1910, §. 6563. In *Gavin* v. *Atlanta,* 86 *Ga.* 132 (12 S. E. 262), it was said that this provision required that two thirds of the qualified voters of the city shall assent before the bonds should be issued,

and that "the legislature has no power to prescribe a less number when that number is legally ascertained," the word "number" being evidently used in the sense of *proportion*. The particular question for determination in that case was whether the total number of qualified voters, and hence the requisite "two thirds," should be ascertained by the tally-sheets of the last general election, as provided by the act of 1878-79, Code of 1882, § 508 (1), or by a special registration as required by an ordinance of the city enacted in pursuance of the charter, or by the common-law rule, that, "where an election is held and a majority or two-thirds vote is necessary, the majority or two thirds of those voting at the election would be sufficient." The special registration was held to be the true test as applied to that case. In the course of the opinion it was said: "If the legislature should not prescribe any means of ascertaining the number of qualified voters, the common-law rule would prevail, and the test would be two thirds of those voting at that election; but as we have said before, we think the legislature has prescribed a different rule in this State, (1) by passing a general law applicable to all counties and municipalities for which no other rule has been enacted, and (2) in providing for registration in certain counties and municipalities. And we are strengthened in this view by the fact that in the Constitution of 1868 the rule laid down was the common-law rule, the language of that Constitution being 'a majority of the qualified voters of such town or city voting at an election held for the purpose' (art. 3, sec. 6, par. 4); while in the present Constitution the words 'voting at an election' are left out, which seems to us to indicate that the convention desired to abolish the former rule, and to prescribe that the number required should be two thirds of all the qualified voters of the county or municipality, and not merely two thirds of those voting at the election."

The court thus compared the Constitution of 1868, making special mention of the words "voting at an election," as contained in that Constitution, and stating also in the same connection that *in* the Constitution of 1868 the rule laid down was the common-law rule. If the rule was so laid down in the Constitution itself, no mere statute could make a different requirement. See also *Mayor &c. of Madison* v. *Wade,* 88 *Ga.* 699 (16 S. E. 21); *Farmer* v. *Thomson,* 133 *Ga.* 94 (65 S. E. 180).

In 1918, the Constitution of 1877 was amended so as to require the assent of "two thirds of the qualified voters thereof, voting at an election for that purpose to be held as prescribed by law: Provided, said two thirds so voting shall be a majority of the registered voters." Code, § 2-5501. In *Chapman* v. *Sumner Consolidated School District*, 152 *Ga.* 450 (109 S. E. 129), and again in *Goolsby* v. *Stephens*, 155 *Ga.* 529 (117 S. E. 439), it was held that the first clause of this amendment required only two thirds of those voting; although it may be that this construction was necessarily compelled by the language of the proviso.

The framers of the revised Constitution were presumably cognizant of the foregoing provisions of the earlier constitutions, and of the interpretations which this court had placed upon them. Accordingly, when the provision here under consideration is viewed in the light of its background, it seems perfectly clear that it was intended to require only a majority of those actually voting, and not a majority of all the qualified voters of the county or municipality—thus returning to the rule as embodied in the Constitution of 1868, where almost the identical language was used.

Furthermore, similar interpretations have been placed on constitutional provisions containing like verbiage in reference to other elections. "No county site shall be changed, or removed, except by a two-thirds vote of the qualified voters of the county, voting at an election for that purpose, and a two-thirds vote of the General Assembly." Code, § 2-8205. In *Wells* v. *Ragsdale*, 102 *Ga.* 53, 58-60 (29 S. E. 165), it was held that this provision, as related to "qualified voters," required the assent of only two thirds of those voting, and that a statute purporting to require two thirds of the qualified voters of the county was to that extent unconstitutional. In the opinion it was said: "Where there is no restriction as to the number of votes necessary to carry or adopt a particular measure, and an election has been regularly ordered and held under the law, a majority of those voting at such election determines the result. But when the assent of a given percentage of the electors is required to determine any result in the affirmative, it must appear that the given number have voted in favor of the measure at the election held. . . The language of the constitutional provision which we are now considering is not that the county site shall be changed or removed by a two-thirds vote of

the qualified voters of the county, but of such qualified voters voting at an election for that purpose; that is, it is only essential in order to authorize a removal that two thirds of the qualified voters of the county who shall vote at such election shall cast their ballots in favor of removal. When a statute requires a question to be decided by the votes of a majority of the voters of a county, this does not require that a majority of all persons in the county entitled to vote shall actually vote in the affirmative but only that the result shall be decided by a majority of the votes cast. In such a case, the proper test of the number of persons entitled to vote is the result of the election as determined by the ballot-box, and the courts will not go outside of that to inquire whether there were other persons entitled to vote who did not do so. McCrary on Elections, § 208. The voters of the county, when such are designated in the statute, are necessarily the voters who vote at the election, since the result in each case must be determined by a count of the ballots cast, and not by an inquiry as to the number not cast. . ·. The distinction therefore is plain, that when a two-thirds vote of the qualified voters of the county is required by law for any given action, two things must appear: first, the whole number of the qualified voters of the county must have been ascertained; and, second, that two thirds of such number voted in the affirmative. But where the provision is that a given measure may be passed by a two-thirds vote of the qualified voters of a county voting in an election held for that purpose, when it appears that two thirds of the whole number voting at such election assented to the measure submitted, it must be held to have been adopted."

That decision was concurred in by all the Justices, and since the language therein construed is so nearly identical with that here under consideration, the decision would appear to be practically controlling upon the question now before us. See also *Floyd County* v. *State of Georgia,* 112 *Ga.* 794 (38 S. E. 37), where the court placed the same construction upon the provision as to changing county sites. Although in that case the question for determination related to the validity of a bond issue, the court took occasion to contrast the provision as to county sites with the debt provision, calling attention to the word "voting" as contained in the former, but not in the latter provision.

Again, the provision of the Constitution of 1877, prescribing the manner in which amendments to that instrument shall be adopted, provided: "If the people shall ratify such amendment or amendments, by a majority of the electors qualified to vote for members of the General Assembly, voting thereon, such amendment or amendments, shall become a part of this Constitution." Code, § 2-8601. In *Cartledge* v. *Augusta,* 189 *Ga.* 267 (2) (5 S. E. 2d, 661), it appeared that the number in the whole State voting for a proposed amendment was 17,059, and that the entire vote against it was 10,230. One of the questions was whether the amendment failed because there were three counties in which no election was held. The court held that it did not, saying, "The tabulation of the result must be based on the number of ballots actually cast throughout the State . . either for or against it." And such has been the common practice and understanding in reference to that provision.

While an intent to change the existing law is not to be lightly inferred, yet the provision here makes a radical change in the constitutional law, and we think that it plainly means only a majority of the qualified voters who actually vote in the election. As was said in *Black* v. *Cohen,* 52 *Ga.* 621, 628 (supra). "Such are the plain words of it;" but even without precedent, the natural and ordinary signification of the language used would seem to be simply a majority of those voting. In the brief for the plaintiff in error, it was suggested that, if the clause in question should be taken to have this meaning, the result will be that burdensome bond issues may now be saddled upon counties and municipalities by organized minorities, without a representative vote of the people. As to this argument, since we consider the meaning of the provision clear, we can only say that the people themselves may avoid such a result by active participation in the elections. In any event, they cannot now, as they could do in the past, vote against a bond issue by simply staying away from the polls.

While the courts of the country are not altogether in harmony on the question here presented, seemingly the weight of authority accords with the conclusion that we have reached. See Munce *v.* O'Hara, 340 Pa. 209 (16 Atl. 2d, 532, 131 A. L. R. 1379), and the interesting annotation following the report of that case in A. L. R.; also 1 Dillon, Municipal Corporations (5th ed.), § 383.

■ The third and final objection was, that the provision of the revised Constitution as to incurring debts by a municipality is not self-executing, and that since the General Assembly has passed no enabling act putting this provision into operation, the City of Decatur could not issue these bonds. There is no merit in this contention. The Constitution of 1877 used the words, "at an election for that purpose, to be held as may be prescribed by law," while the language in the present Constitution provides, "in an election for that purpose to be held as prescribed by law." It took an enabling act for the Constitution of 1877. *Hudson* v. *Marietta,* 64 *Ga.* 287. But such an act was passed in 1879. *Elliott* v. *Gammon,* 76 *Ga.* 766; Ga. L. 1878-79, p. 40. This statute, only slightly changed, now appears in the present Code as §§ 87-201 et seq., the changes having been made after the constitutional amendment of 1918, and apparently having been inserted by the codifiers, to conform to that amendment. Compare Civil Code, 1910, § 442, 443; Code of 1933, §§ 87-203, 87-204.

In *Lee* v. *Tucker,* 130 *Ga.* 43 (60 S. E. 164), this court held that an act of the General Assembly relating to a change of county site did not fall because of its conflict with the Constitution as to the number of votes required to remove or change a county site. It was said that the sole purpose of the act was to provide machinery to carry out the constitutional provision by providing an election, and that by striking out its requirements as to the number of votes, which had already been fixed by the Constitution, the act remained complete and capable of being carried out in accordance with the legislative intent. In *Chapman* v. *Sumner Consolidated School District,* 152 *Ga.* 450 (supra), which arose after the adoption of the constitutional amendment of 1918, it was held that the previously existing statute (Civil Code, § 442 (87-203)), should be construed consistently with such amendment.

So, in the instant case, we hold that the statute providing for such elections must still be given effect, subject to the change as made by the revised Constitution in reference to the proportion of qualified voters necessary to authorize a bond issue; and that no further enabling act was necessary. See also, in this connection, *Hammond* v. *Clark,* 136 *Ga.* 313 (10) (71 S. E. 479, 38 L. R. A. (N. S.) 77); *Wheeler* v. *Board of Trustees of Fargo Consolidated School District,* supra; 11 Am. Jur. 643, § 36; 16 C. J. S. 91, § 43.

*Judgment affirmed. All the Justices concur.*