IN THE

# SUPREME COURT OF TENNESSEE,

FOR THE

## MIDDLE DIVISION.

---

### NASHVILLE, DECEMBER TERM, 1906.

---

HOME TELEGRAPH COMPANY *v.* MAYOR AND CITY COUNCIL
OF NASHVILLE.

(*Nashville.* December Term, 1906.)

1. **CONSTITUTIONAL LAW.** Requirement as to noting on the
journals the fact of the signing of bills by speakers is direc-
tory, and not mandatory.

The constitutional provision requiring the fact of the signing
of legislative bills by the respective speakers in open session
to be noted on the journals is merely directory, and not man-
datory. (*Post, pp.* 6-15.)

Acts cited and construed: 1885, ch. 66.

Const. cited and construed: Art. 2, sec. 18.

Cases cited and approved: State v. McConnell, 71 Tenn., 341;
Gaines v. Horrigan, 72 Tenn., 611; Williams v. State, 74 Tenn.,
553; Brewer v. Huntingdon, 86 Tenn., 737; State, ex rel., v.
Algood, 87 Tenn., 163; Nelson v. Haywood County, 91 Tenn.,
596; Railroad v. Telegraph Co., 101 Tenn., 66; and numerous
cases from other States cited in the opinion on pages 10-13.

10 Cates]                                              (1)

Telegraph Co. v. Nashville.

2. **SAME. Same. Act signed by speakers and approved by governor is properly passed, unless contrary is shown by journals; case in judgment.**

An act signed by the speakers of the senate and house, and approved by the governor, will be treated as properly passed, unless the contrary is shown by the journals, and the contrary is not so shown where the house journal fails to show that it was signed by the speaker in open session. (*Post, pp.* 6-15.)

See citations under first headnote.

3. **TELEGRAPHS AND TELEPHONES. Telegraph corporation cannot do a telephone business under its telegraph charter.**

A telegraph corporation is not authorized to install a telephone plant or system and do a telephone business under a telegraph charter. (*Post, pp.* 15-23.)

Code of 1858 cited: Sec. 1316.

Acts cited and construed: 1849-50, ch. 111; 1875, ch. 142, sec. 8; 1885, ch. 66; 1889, ch. 204.

Cases cited and approved: Richmond v. Telephone Co., 174 U. S., 761; Toledo v. Telegraph Co., 46 C. C. A., 111.

4. **TELEPHONE CORPORATIONS. For transmission of messages were not authorized before Acts of 1907, ch. 134.**

Before the passage of the Talbert bill (Acts 1907, ch. 134), there was no statute in Tennessee authorizing the incorporation of telephone companies for the transmission of messages. (*Post, pp.* 18, 19.)

Acts cited and construed: 1875, ch. 142, sec. 8; 1883, ch. 232; 1885, ch. 66.

---

FROM DAVIDSON.

---

Appeal from the Chancery Court of Davidson County. —JOHN ALLISON, Chancellor.

BAXTERS and LUKE LEA, for complainant.

HILL McALISTER and J. C. BRADFORD, for defendant.

MR. JUSTICE WILKES delivered the opinion of the Court.

The complainant is a telegraph company, organized on the 26th of January, 1906, under section 8, c. 142, p. 243, Acts 1875.

It sought to enter the city of Nashville with its lines and plant, and was denied the right to use the streets and alleys of the city for that purpose by the mayor and city council. This bill is to enjoin the mayor and city council, which will be hereafter referred to as the city, from preventing said entrance and occupying the streets, alleys, avenues, squares, and public thoroughfares, by placing thereon poles, wires, cross-arms, guides, braces, and other necessary fixtures, for the installation and operation of its system or plant in the city of Nashville.

An injunction was granted, which was afterwards dissolved. An answer was filed, proof was taken, and on final hearing the chancellor refused to grant the relief prayed for, and dismissed complainant's bill; and the complainant appealed. The court of chancery appeals reversed the holding of the chancellor, and the city has appealed to this court.

The purpose of the company is stated in the bill and charter to be to construct a telegraph line from Frank-

lin, in Williamson county, to Goodlettsville, in David-
son county, and in doing so it claims the right by law
to erect all necessary fixtures along the line of any pub-
lic highway, or the streets of any village or city, or
any lands belonging to the State, free of charge; and
such is the provision of its charter.

It proposes, not only to pass over the streets, alleys,
and highways of the city, but to install not less than
thirty instruments therein, with the latest improvements,
appliances, and inventions, for the operation of a tele-
phone system or business in the city, and between the
city and other points beyond its limits.

Its purpose is thus expressed in section 4 of the bill:
"Complainant purposes and intends to erect its poles and
wires over and along the streets and alleys of the several
cities hereinbefore mentioned, and the highways and
public roads connecting them, for the purpose of estab-
lishing numerous terminals or stations, where it will
receive and transmit messages over its own lines to any
address within the city of the forwarder, or in any of
the aforesaid cities, or to transmit said message by means
of intertraffic arrangements with other telegraph com-
panies, which are being negotiated successfully at pres-
ent, to the cities throughout the country. . . . It
will establish at its public and private stations both tele-
graph and telephone instruments, utilizing the latest im-
provements and inventions in the science of telegraphy,
which permit the same wire to be used at the same time

for the transmission of messages through both of said instruments."

The city in its answer says that it has not granted or given any permit or license to complainant to occupy the city, and that it is barred from doing so by an ordinance of the city, which is in these words:

"It shall be unlawful for any person, firm, or company, or corporation, to erect and run wires along, over, or through the streets or alleys of the city, or over the private property or grounds of any person in the city, for signalling or electrical purposes, without first obtaining the consent of the mayor and city council to do so; and any person, firm, etc., who shall violate the provisions of this section shall be deemed guilty of a misdemeanor and fined before the judge of the city court, not less than $25 nor more than $50 for each offense."

The contention of the city is, in brief, that no telegraph or telephone company can occupy its streets, without first obtaining its consent, and that under its charter, being chapter 204, p. 405, Acts 1899, it has the right to prescribe the mode and manner in which a franchise, or permit, shall be granted by the city.

Complainant claims the right to occupy the streets of the city, without its consent, and over its protest, under chapter 111, p. 303, Acts 1849-50, section 1316, Code 1858, section 8, c. 142, p. 243, Acts 1875, and chapter 66, p. 120, Acts 1885.

The Code of 1858, following the act of 1849-50, provided that any person or corporation may "construct a

telegraph line along the public highways and streets of this State or other lands belonging to the State, free of charge, . . . and may erect the necessary fixtures therefor."

The act of 1875 provides that a telegraph corporation may construct a telegraph line and erect the necessary fixtures along the line of any public highway, the streets of any city or village, etc.

Acts 1885, p. 120, c. 66, provides that "any person or corporation, organized by virtue of the laws of this State, . . . for the purpose of transmitting intelligence by magnetic telegraph or telephone, or other system of transmitting intelligence, the equivalent thereof which may be hereafter invented or discovered, may construct, operate, and maintain such telegraph, telephone, or other line necessary for the speedy transmission of intelligence, along and over the public highways or streets of the cities and towns of this State," etc.; "but the ordinary use of such public highways, streets," etc., "shall not be obstructed," etc.

It is said that this latter act is unconstitutional.

The objection is that it does not appear from any entry on the journal of the house of representatives that it was ever signed by the speaker of the house in open session.

The constitutional provision brought in question is section 18 of article 2, and is in these words: "No bill shall become a law until it shall have been . . . signed

by the respective speakers in open session, the fact of such signing to be noted on the journals," etc.

This provision has been before this court on several occasions; but we consider its proper construction as still an open question.

In *Railroad* v. *Telegraph Company,* 101 Tenn., 66, 46 S. W., 571, 41 L. R. A., 403, the constitutionality of this same act was challenged upon the same ground; but, it not being necessary to pass upon it, the court declined to do so, saying that it was a question of grave difficulty and doubt.

The facts are that the act as enrolled and deposited in the office of the secretary of state is signed by both the speaker of the senate and the house, and is approved by the governor, and it so appears in the Acts published by the authority of the State. There is no entry on the house journal showing that this act was signed by the speaker of the house in open session; but there is an entry on the house journal showing that the bill was transmitted to the house from the senate for the signature of its speaker, on the afternoon of March 24, 1885, and there is an entry on the senate journal on the same afternoon recording a message, signed by the clerk of the house, and stating that the said act had been signed by the speaker of the house of representatives. And the senate journal contains a further entry that the bill was signed by the speaker of the senate.

We refer to the following cases as bearing, more or less, upon the question.

In *State* v. *McConnell,* 71 Tenn., 341, the court, in discussing whether a statute enrolled and signed by the respective speakers, and approved by the governor, could be attacked on account of procedure in its enactment and the journals looked to, said: "The bill concedes that the act under consideration was signed by the speakers of both houses of the legislature and by the governor. Under these circumstances, the presumption in favor of the regularity of the passage of the act, through all its stages, is so strong, that the mere failure of the journal of the senate to show a second reading, if the fact be that way, would not affect its validity, but would be treated as a mere clerical omission."

In the case of *Gaines* v. *Horrigan,* 72 Tenn., 611, the court said: "Many authorities are referred to to show that notwithstanding an act has the signature of the two speakers and the approval of the governor, and is published by the proper authority, nevertheless the court may look to the journals of the two houses; and if from them it appears that the bill was not constitutionally passed, the act must be declared void. Such seems to be the decided weight of authority."

In *Williams* v. *State,* 74 Tenn., 553, the court said: "The only question, therefore, that is raised by these facts is whether the failure of the journal of the house to show affirmatively that the bill received, on its third reading, the constitutional majority, is fatal. The rule is that the journals may be looked to in order to determine whether the bill was in fact passed, but the very

reasonable presumption must be made in favor of a legislative body acting in the apparent performance of its legal function."

In *Brewer* v. *Mayor,* 86 Tenn., 737, 9 S. W., 168, the court, in deciding the same question, said: "We hold now that irregularities will be cured and omissions supplied by presumptions; but, where it appears that a bill was rejected, the journal entry so showing cannot be disregarded, and the act is void."

In the case of *State, ex rel.,* v. *Algood,* 87 Tenn., 163, 10 S. W., 310, the senate journal showed that the statute in question had been rejected in the senate, and that a motion to reconsider had been entered; and though there was no record of any action on the motion to reconsider, the court held that the act would be presumed to have been regularly called up and favorably acted upon.   The court said: "We think the rule well settled that, where the journal does not affirmatively show the defeat of the bill, every reasonable presumption and inference will be indulged in favor of the regularity of the passage of an act subsequently signed in open session by the speaker."

This case was cited with approval in *Nelson* v. *Haywood County,* 91 Tenn., 596, 20 S. W., 1, as was also a quotation from *Field* v. *Clarke,* 143 U. S., 649, 12 Sup. Ct., 495, 36 L. Ed., 294; the court holding in regard to an irregularity in the enactment of a statute that it would not presume that the legislature was derelict in such an important particular.

Many cases from other States may be cited holding

similar doctrines, such as *Sherman* v. *Story,* 30 Cal., 253, 89 Am. Dec., 93; *Weeks* v. *Smith,* 81 Me., 538, 18 Atl., 325; *Hunt* v. *Wright,* 70 Miss., 298, 11 South., 608; *Standard Cable Co.* v. *Attorney-General,* 46 N. J. Eq., 270, 19 Atl., 733, 19 Am. St. Rep., 394; *State* v. *Young,* 32 N. J. Law, 29; *State* v. *Glenn,* 18 Nev., 34, 1 Pac., 186; *State* v. *Swift,* 10 Nev., 176, 21 Am. Rep., 721; *Speer* v. *Plankroad,* 22 Pa., 376; *Day L. & C. Co.* v. *State,* 68 Tex., 536, 4 S. W., 865; *Ex parte Tipton,* 28 Tex. App., 438, 13 S. W., 610, 8 L. R. A., 326; *Williams* v. *Taylor,* 83 Tex., 667, 19 S. W., 156; *State, ex rel.,* v. *Jones,* 6 Wash., 452, 34 Pac., 201, 23 L. R. A., 340.

In *State* v. *Young,* supra, it is said: "Can any one deny, that, if the laws of the State are to be tested by a comparison with these journals, so imperfect, so unauthenticated, that the stability of all unwritten law will be shaken to its very foundation. It is scarcely too much to say that the legal existence of almost every legislative act would be at the mercy of all persons having access to these journals; for it is obvious that any law can be invalidated by the interpolation of a few lines, or the obliteration of one name and the substitution of another in its stead. I cannot consent to expose the State legislature to the hazard of such probable error or facile fraud."

In *Sherman* v. *Story,* supra, it is said: "Better, far better, that a provision should occasionally find its way into the statutes through mistake, or even fraud, than that every act, State and national, should at any and all

times be liable to be put in issue, and impeached by the journals, loose papers of the legislature, and parol evidence. Such a state of uncertainty in the statutes would lead to mischief, absolute and intolerable."

In *Weeks* v. *Smith,* supra, the court said: "Legislative journals are made amid confusion of the dispatch of business, and are therefore much more likely to contain errors than the certificates of the presiding officers are to be untrue. Moreover, public policy requires that the enrolled statutes of our State, fair upon their face, should not be put in question after the public had given faith to their validity. No man should be required to hunt through the journals of the legislature to determine whether a statute, properly certified by the speaker of the house and the president of the senate, and approved by the governor, is a statute or not."

Of the forty-six constitutions adopted by the different States of the Union and the United States, the following States, to wit, Alabama, Colorado, Missouri, Montana, North Dakota, South Dakota, Tennessee, Texas, Utah, and Wyoming, have provisions in their constitutions requiring that the fact of signing of bills by the speakers shall be entered on the legislative journals.

The language of this section of the constitution of Tennessee of 1870 is as follows:

"No bill shall become a law until it . . . shall have been signed by the respective speakers in open session, the fact of such signing to be noted on the journal."

The language of this clause in each of the other nine

constitutions containing similar provision employs the word "shall" in a manner similar to that shown by the following quotation from section 38 of article 3 of the constitution of Texas:

"The presiding officer of each house shall, in the presence of the house over which he presides, sign all bills and joint resolutions passed by the legislature, after their titles have been publically read before, and the fact of such signing shall be entered on the journal."

This particular clause in the constitutions of the ten States named above has been judicially construed in Colorado, Missouri, Montana, Texas, and Wyoming. *In re Roberts* (1881), 5 Colo., 525; *State* v. *Mason* (1900), 55 S. W., 637, 155 Mo., 486; *State* v. *Mead*, 71 Mo., 271; *State* v. *Long*, 21 Mont., 26, 52 Pac., 645; *Hunt* v. *State*, 22 Tex. App., 396; *State* v. *Swan*, 7 Wyo., 166, 51 Pac., 209, 40 L. R. A., 195, 75 Am. St. Rep., 889; *State* v. *Gillespie*, 12 Wyo., 284, 75 Pac., 1135; *State* v. *Cahill*, 12 Wyo., 225, 75 Pac., 433.

In the case of *In re Roberts*, supra, and the two cases for Missouri—*State* v. *Mason*, and *State* v. *Mead*—the courts held squarely that the clauses of the constitution of Colorado and Missouri, respectively, requiring that the fact of the signing of the bills by the speakers shall be entered on the journal, were clearly directory and not mandatory.

In the case of *In re Roberts*, supra, was construed section 26 of article 5 of the Colorado constitution, which provides that:

"The presiding officer of each house shall, in the presence of the house over which he presides, sign all bills and joint resolutions passed by the general assembly, after their titles shall have been publicly read, immediately before signing; and the fact of signing shall be entered on the journal."

The court said: "In respect to the other objection that it does not appear by the record that the bill was signed by the speaker in the presence of the house, we must hold that section 26 of article 5 of the constitution is directory merely, in so far as it relates to the requirement that the fact of signing shall be entered on the journal."

In the case of *State* v. *Long,* supra, although section 29 of article 3 of the constitution provides, "The provisions of this constitution are mandatory or prohibitory unless by express words they are declared to be otherwise," and section 27 of article 5 provides that "the presiding officer of each house shall, in the presence of the house over which he presides, sign the bills and joint resolutions passed by the legislative assembly, immediately after their titles have been publicly read and the fact of signing shall be at once entered on the journal," the court held the act in question valid and constitutional, saying:

"The journal omitted to show the fact that the bill in question was signed by the presiding officer of each house. The enrolled bill bears the signature of such presiding officers, and appellants do not aver or argue that

the bill was not, as a fact, duly signed by such presiding officers. The presumption is that the legislature and the officers thereof did their duty and that the enrolled bill was regularly passed."

A careful analysis of section 18 of article 2 of our constitution shows that it contains five clauses using the language ordinarily construed to be mandatory:

First, every bill shall be read once on three different days, and passed each time in the house where it originated, before transmission to the other.

Second, no bill shall become a law until it shall have been read and passed on three different days.

Third, until it shall have received on its final passage in each house the assent of a majority of all the members to which that house shall be entitled under this constitution.

Fourth, until it shall have been signed by the respective speakers in open session.

Fifth, until it shall have received the approval of the governor, or passed without it, as otherwise provided for.

And each of these five mandates was expressed by the use of the mandatory word "shall," an equivalent of the word "must."

Hedged in between the fourth and fifth clauses is the provision of the "fact of such signing [referring to the signing by the speaker] to be noted on the journal."

The use of the mandatory "shall" in the first four, the substitution for it of the suggestive or directory "to be" in this clause, and the immediate return to the use

of the mandatory "shall" in the sixth clause of this section, indicates that the framers of this section of the constitution made a distinction between the several requirements prescribed therein and used apt words to express this distinction.

An opposite view and contrary holding would lead to confusion and disastrous results, in view of our legislative history. It would put it in the power of the journal clerk of either house, by design or negligence, to nullify any legislation, no matter how important, by simply omitting the necessary entry upon the journal, or erasing or changing an entry already made; and this latter could easily be done, inasmuch as bills are simply referred to by their number.

It appears from the certificate of the secretary of state that the omission we are now considering is made in 176 acts passed at nine sessions of the general assembly. Many of these are the most important laws upon our statute books. Public policy, therefore, suggests that this provision of the constitution should be held to be merely directory, and not mandatory; and such is our construction. Acts bearing the signature of the speakers, and approved by the governor, will be treated as properly passed, unless the contrary is shown by the journals.

We are of opinion, therefore, that the act in question is not unconstitutional because of the defect pointed out and complained of.

It is next said that a body incorporated as a telegraph company is not authorized to do a telephone business,

and that there is no statute in Tennessee authorizing the incorporation of a telephone company.

It is replied to this that the telephone and telegraph are one and the same thing, based upon the same principle, and that the telephone is simply an improved telegraph.

Looking at this question from a scientific standpoint, we think that this is true; but it is apparent, and must be conceded, that quite a difference exists between telegraph and telephone systems in matters and particulars that affect the issues in this case.

A telegraph system does not require so many wires, poles, and fixtures as does a telephone system. In a city like Nashville a telegraph would require but one or two lines and rights of way for purposes of entrance and exit. It would have but few stations, from which messages would be delivered to the various parts of the city by messengers.

A telephone system, however, to be effective, requires, not only rights of way to enter and leave the city, but also to occupy all its streets and alleys, and to enter its business houses, residences, and other places, thus making it necessary to use many poles and wires and other fixtures, in order to do the business expected of it. It must therefore, necessarily, make use of the streets and alleys generally of the city, and incumber them with a network of wires and poles and fixtures, to a much greater extent than a telegraph system would do.

It is said that telegraphs, telephones, and commercial railroads stand upon a different footing from street car

Telegraph Co. v. Nashville.

systems, since the latter are necessarily local, and their control affects the inhabitants of the city; but it must not be forgotten that telegraphs, telephones, and commercial roads may use the city's streets as a mere way of passage through the city from point to point, or for the purpose of doing, in addition, a local business.

It has been held that a commercial railroad may, under restrictions, occupy the streets of a city, without its consent; but it has not been held that it may use the streets and alleys generally for the purpose of side tracks, switches, spurs, and loops, or to lay a network of rails through the various thoroughfares of the city, and thus incumber them for purposes of ordinary use.

It is difficult to see why a telegraph or telephone company, in the prosecution of its local business within the limits of the city, should not be subject to the control of the same, in the same manner as is a street car system; and it is not unreasonable to hold that while a telephone or telegraph line, like a commercial railroad, may pass through a city over its streets, yet, when it stops to do a local business, it must do like the local enterprise—submit to the control of the city as to all business done within its limits.

Complainant in this cause is claiming the right, and asserting its purpose, to do a local, as well as a long-distance or foreign, business. While there are material differences between telegraph and telephone companies, and in the manner in which they are operated, we feel called upon only to note such differences as may be

10 Cates—2

deemed material to the city, because of the occupation of its streets.

To the differences already adverted to may be added the greater danger to human life, caused by the network of telephone wires, which are liable to become displaced, broken, or defective, and to cross the wires of telegraph and electric light companies, causing death or injury to persons passing along the street, to whom the city owes the duty of protection; also, the increased risk of fires, caused by defective, broken, or crossed wires, caused by their blowing down in storms, and the blocking of the streets by fallen poles and tangled wires. These and other incidents of telephone operations impose on the streets of the city a burden which a telegraph company does not, and from the very nature of things cannot do.

Not until the passage of the Talbert bill has there been any authority under our statutes to incorporate a telephone company, whose purpose it is to transmit messages as complainant proposes to do. It is true that the act of 1883 authorized charters for telephone companies, but that act simply gave such companies the power to manufacture electricity for telephone purposes — that is, to erect and install power houses—but gave no authority to erect a pole, or to string a wire, or to install a plant for the transmission of messages.

When the act of 1849-50 was passed, telephones were not invented, and when the act of 1875 was passed the invention had not assumed a practical shape. In its legislation at these dates, with regard to telegraphs, the

general assembly did not have in view telephones; and since that date they have in our legislation been recognized as separate matters, closely connected, to be sure, but different in many respects.    To illustrate:   Our revenue laws tax them separately, and as distinct property, and on a different basis; telegraphs being taxed upon their length of wires, while telephones are taxed on the number of boxes and the population of the city.

Their modes and apparatus are different.   Skilled experts, only, can operate the telegraph; but any child may operate, or assist in operating, the telephone.   Only the employees of the telegraph can manipulate its instruments and understand its signals; but all the patrons and the public generally cooperate with the employees of the telephone in its use.   The telephone transmits the human voice.   The telegraph does not.

But the complicated, burdensome, dangerous character of its structure and fixtures is the feature of the telephone system which makes it cumbersome upon the streets of the city, and makes it necessary that it should be under the control and supervision of the city, whose duty it is to keep the streets safe and to protect the lives and property of its citizens.

A telephone company has no more right to occupy the streets under a telegraph charter than a street car company would have under an interurban, or commercial, railroad charter.

We are of opinion, therefore, that complainant cannot operate a telephone system, such as it proposes, in the

city of Nashville, under the authority and power given
to it as a telegraph corporation.

The exact question was involved and passed upon di-
rectly in the leading case of *Richmond* v. *Southern Bell
Tel. Co.,* 174 U. S., 761, 19 Sup. Ct., 778, 43 L. Ed., 1162.
In that case, the telephone company installed its plant
upon the streets and within the city of Richmond, Va-
ginia, by the consent and under a grant from the city au-
thorities.   The company afterwards had a disagreement
with the city, and the latter revoked its permission to the
company to use the streets for telephone purposes; and
the company sought to compel the city to allow the use
of the streets for that purpose.   The telephone company
was operating under a power conferred by congress upon
telegraph companies, and it was insisted that it had no
right under such authority to operate a telephone sys-
tem.

The supreme court of the United States, reversing the
court below, said:

"It may be that the public policy intended to be per-
mitted by the act of congress of 1866 would suggest the
granting to telephone companies of the rights and privi-
leges accorded to telegraph companies.   And it may be,
if the telephone had been known and in use when that
act was passed, the congress would have embraced with-
in its provisions companies employing instruments for
electrically transmitting articulated speech.   But the
question is, not what the congress might have done in
1866, nor what it may or ought now to do, but what was

Telegraph Co. v. Nashville.

in its mind when enacting the statute in question. Nothing was distinctly known of any device by which articulate speech could be electrically transmitted or received between different points, more or less distant from each other, nor of companies organized for transmitting messages in that mode. Bell's invention was not made public until 1876. Of the different modes now employed to electrically transmit messages between distant points, congress, in 1866, knew only of the invention then and now popularly called the "telegraph." When, therefore, the act of 1866 speaks of telegraph companies, it could have meant only such companies as employed the means then used or embraced by existing inventions for the purpose of transmitting messages merely by the sounds of instruments and by signs of writings. It is not the function of the judiciary, because of discoveries after the act of 1866, to broaden the provisions of that act, so that it will include corporations or companies that were not and could not have been at that time within the contemplation of congress. If the act be construed as embracing telephone companies, numerous questions are readily suggested. May a telephone company, of right, and without reference to the will of the cities, construct and maintain its wires in every city in the territory in which it does business? May the constituted authorities of a city permit the occupancy only of certain streets for the business of the company? May the company of right fill every street and alley in every city or town in the country with poles over which its wires are strung, or

may the local authorities forbid the erection of any poles at all? May a company run wires into every house of the city, as the owner or occupant may desire, or may the local authorities limit the number of wires that may be constructed and used within its limits? . . .

"But even if it were conceded that no such confusion would probably arise, it is clear that the court should not construe an act of congress relating in terms only to telegraph companies as intended to confer upon companies engaged in the telephone business any special rights in the streets of cities and towns of the country, unless such an intention has been so manifested. The conclusion that the act of 1866 confers upon telephone companies the valued rights and privileges therein specified is not authorized by any explicit language used by congress, and can be justified by implication only. But we are unwilling to rest the construction of an important act of congress upon implication merely, particularly if that construction might tend to narrow the full control always exercised by the local authorities of the States over streets and alleys within their respective jurisdiction. If congress desires to extend the provisions of the act of 1866 to companies engaged in the business of electrically transmitting articulate speech, . . . let it do so in plain words. It will be time enough, when such legislation is enacted, to consider any questions of constitutional law that may be suggested by it."

See, also, *Toledo* v. *Western Union Tel. Co.,* 46 C. C. A., 111, 107 Fed., 10, 52 L. R. A., 730.

Telegraph Co. v. Nashville.

We pretermit all discussion of the provisions and effect of Acts 1885, p. 120, c. 66, and also Acts 1899, p. 405, c. 204, which is the charter of the city of Nashville, since complainant could not at the time the suit was brought, nor at this time, install a telephone plant and do a telephone business under a telegraph charter; and this is its main, if not only, object and purpose.

We cannot for a, moment credit the theory that the complainant intended to do a telegraph business, except in connection with its telephone business, and as a mere incident to it. The idea of a line from Franklin to Goodlettsville to do a telegraph business alone is too preposterous to entertain. But, on the other hand, the pleadings and record, as well as briefs of counsel and their arguments, leave no ground for doubt that the installation of a telephone plant and the doing of a telephone business is the object sought to be accomplished, and without this there would be no suit.

It follows that the decree of the court of chancery appeals must be reversed, the injunction dissolved, and complainant's bill dismissed, at its cost.