## DeLOACH *et al. v.* NEWTON *et al.*

1. When considered as a whole, the petition on which the ordinary of Tattnall county ordered an election in the school district of that county known as the Claxton-Hagan district was in substantial compliance with the law, and the election so ordered and held was not void on the ground that such petition furnished no basis for the order, so as to authorize an injunction to be granted against the levy of the local tax in such school district by virtue of the election.

2. The act of August 23, 1905 (Acts 1905, p. 425), as amended by the act of August 21, 1906 (Acts 1906, p. 61), provides for the laying out of counties into school districts by the county boards of education, and that such boards shall order an election for trustees in the respective districts so laid out. Whenever the citizens of any school district, in a county not levying a local tax for educational purposes, wish to supplement the funds received from the State school fund by levying a tax for educational purposes, they shall present to the ordinary a petition from one fourth of the qualified voters of the district, and thereupon the ordinary shall order an election to determine the question of local taxation. There is no provision in either of said acts for the ordinary to order an election to determine whether a school district shall be laid out, or for the purpose of electing trustees in such a district.

3. If a school district had been duly laid out, and upon a petition of one fourth of the qualified voters thereof the ordinary ordered an election to determine the question of local taxation, but also included in his order that trustees for the school district should be elected, which was done, and the county board of education, although it did not order the election of such trustees, recognized and approved the persons elected as such and caused them to be commissioned, and they acted as trustees under such commissions, they were de facto officers, and their actions as such, which de jure officers would be authorized to perform under the law, could not be collaterally attacked as void on account of the manner of their election.

(a) After the trustees of a school district were thus elected and commissioned, upon the expiration of the terms of two of them the board of education of the county ordered an election to be held to select successors for them: semble, that the persons so selected for the new terms, whether the same as those originally elected or not, after such election and being commissioned thereunder, were de jure trustees. ·   ·   ·   :

4. The petition to the ordinary for the purpose of calling an election to determine the question of levying a local school tax in a district should be signed by the petitioning voters themselves. There is no provision for an attorney at law to present a petition, signed only by him, as the representative of a number of voters. The signature of one acting as an attorney can not take the place of the signatures of the voters.

(a) In the present case a petition was signed by persons purporting to constitute one fourth of the qualified voters of the district. A copy of this was attached to an additional petition to the ordinary, signed by certain persons as attorneys for the petitioners. The latter petition was not a substitute for, or in lieu of, a petition by the voters, and the persons named in it also signed the other petition. This mere duplication of petitions did not operate to invalidate the original petition signed by the requisite number of voters.

5. If an enrolled act of the legislature was duly signed by the president of the Senate and the speaker of the House and approved by the Governor, and deposited in the office of the secretary of State, it was not competent to attack its validity on the ground that the legislative journals showed that the bill originated in the House, was there passed by a constitutional majority and transmitted to the Senate, where it was amended and passed by a constitutional majority, and then transmitted to the House, where the Senate amendment was concurred in, but failed to show that this was done by a constitutional majority.

JULY 13, 1910.

Petition for injunction. Before Judge Rawlings. Tattnall superior court. August 28, 1909.

*Hines & Jordan,* for plaintiffs.

*J. P. Moore* and *Gordon Saussy,* for defendants.

FISH, C. J. Certain persons, as citizens and taxpayers, sought to enjoin the collection of a tax in a school district in Tattnall county. On the hearing of the application for an interlocutory injunction it was refused, and they excepted. It was contended that the election, which was held under the act of August 23, 1905 (Acts 1905, p. 425), as amended by the act of August 21, 1906 (Acts 1906, p. 61), was invalid, because the petition on which the ordinary based his order for an election was insufficient, and the election held was therefore void. The petition to the ordinary stated that "The undersigned qualified voters of said county respectfully show the following facts." It was contended that this showed a petition by the voters of the county, and not those of the district. But later in the petition it was stated, "That the undersigned petitioners represent more than one fourth of the qualified voters in said proposed district," thus showing that the signers purported to be qualified voters both of the county and the district.

and the petition showed plainly that they were acting as such and with reference to a district election. There was no contention that the district had not already been laid out by the county board of education as provided by law, and while the petition referred to establishing a school district, there is nothing to show that the district was not already established; and the real thing sought was to provide for local taxation within it. It was said that the petitioners did not seek to have local taxation, or show under what act they were proceeding, but they stated, "That they desire to establish a school district to be maintained by local taxation pursuant to the amended act of August, 1906, of the acts of the General Assembly of said State;" and they prayed, "that your honor order an election for said proposed district, pursuant to the act above referred to." This sufficiently indicates that the petitioners were proceeding under the act of August 21, 1906, which was the only act passed in that year touching the subject of such elections. While the language used may not have been exact, it was sufficient to show that the thing desired was an election in regard to the maintenance of the school by local taxation, pursuant to the act mentioned, and not merely to establish a school district. *Coleman v. Board of Education,* 131 *Ga.* 643 (7), 652 (63 S. E. 41). In stating the number of qualified voters who signed the petition, it was said, "the undersigned petitioners represent more than one fourth of the qualified voters in said proposed district." It is evident that this meant that "the undersigned" were more than one fourth of such voters. It would be a strained construction to hold that the petitioners meant that they were acting as agents or representatives of such voters, and to upset the election on that ground. Town of Solon *v.* Williamsburg Savings Bank, 35 Hun, 1, 7. The petition, thus amended, was not presented alone, but another petition, covering substantially the same ground, though differently expressed, and having attached to it a copy of the original petition signed by the voters, was also presented. This was signed by a firm of attorneys. The law provides for such a petition to the ordinary to be made by one fourth or more of the qualified voters of the district. There is no provision of law for having a petition of this character signed by attorneys, nor will the signature of attorneys take the place of the signatures of the qualified voters. Still, as it appears there was an original petition,

signed by the voters, which was presented to the ordinary, the duplication will not affect the validity of his action on the proper petition. The plaintiffs alleged that the original petitions could not be found in the ordinary's office, but the answers set up that they had been found there, and they were tendered in evidence.

There was no law authorizing the ordinary to call an election for the selection of trustees for the school district, nor was there any prayer for this in the petition presented to him. Nevertheless, in addition to ordering an election to determine the question of local taxation, he ordered that three school trustees should be elected for the district. It appears that this was done, and that the county board of education recognized and approved the three trustees thus elected and commissioned them; and it appears also that the persons so elected proceeded to discharge the duties of such trustees until the terms of two of them had expired, when successors were elected by order of the county board of education. The three first elected were, at least, de facto officers, and the two last elected were probably de jure officers. At any rate, the official acts of such trustees were not subject to collateral attack. *Brown v. Flake*, 102 *Ga.* 528 (29 S. E. 267).

Objection was also made to the sufficiency of the allegations of the petition to the ordinary, on other grounds; but the petition, taken as a whole, was substantially sufficient. It was not so lacking in jurisdictional averments as to render the election void.

It is contended that the act of 1906 is unconstitutional, on the ground that the journals of the House of Representatives and the Senate do not show that it was enacted in the manner prescribed by the constitution, the contention being based upon the following facts derived from these journals: The act originated in the House of Representatives and was there passed by a constitutional majority. It was then transmitted to the Senate, where certain amendments were made, and, as amended, was passed by that body by a constitutional majority. It was then returned to the House, where the Senate amendments were concurred in, but the journal of the House does not show by what vote this was done. It is not contended that the enrolled act was not duly signed by the president of the Senate and the speaker of the House and approved by the Governor, and deposited in the office of the secretary of State. The question is, whether the omission from the journal of the

House of a statement showing that the Senate amendments to the House bill were concurred in by a majority of all the members elected to the House invalidates the act. The decisions in regard to whether the journals of legislative bodies will be looked to for the purpose of invalidating an act of the legislature apparently regular on its face, and, if so, to what extent such journals may be considered, is one which has been productive of many decisions, and much conflict. Some of the courts, it must be conceded, have not only rendered decisions conflicting with those of other courts but also with those previously rendered by themselves. The decisions may be generally classified under four heads: First, those holding that the enrolled act, duly signed by the presiding officers of the two branches of the legislature and approved by the Governor, and lodged with the secretary of State, is conclusive, and can not be shown to be invalid by reference to the journals. Second, those which hold that the enrolled act, thus signed, approved, and deposited, is not conclusive, but that the legislative journals can be examined to see whether the act has been constitutionally passed. This class of decisions consider the journals as in the nature of minutes or the ultimate documentary evidence of what was done by the legislature, and hold, not only that an affirmative entry upon a journal showing a violation of the constitutional method of enacting laws will invalidate an act, but also that the journal being the complete evidence of legislative action, silence is equivalent to negation and the failure of the journal to show that a constitutional provision was complied with is equivalent to a statement that it was not complied with, and hence is equally fatal to the act as a direct statement of non-compliance. Third, those which hold that such enrolled act is not conclusive, and that the journals may be examined for certain purposes, but that a failure of the journals to show a full compliance with the constitutional provisions in regard to the modes of passage of acts will not cause the act to be held unconstitutional, and that this will only be done where the entries on the journals affirmatively show that the act has not been constitutionally passed. Fourth, decisions which do not rest upon general rules or principles, but set up as a basis the peculiar or special language of the constitution under the consideration. For the present, we will lay aside the class of cases last mentioned and consider those based upon reason

and principle rather than upon special words.   The third class of decisions mentioned, which go behind the enrolled act duly signed, approved, and deposited, and consider the journals for the purpose of invalidating the act, but which hold that an affirmative entry on the journal showing non-compliance with constitutional provisions will accomplish that result, but an absence of such an entry, or an entry which does not show that constitutional provisions were complied with, will not so operate, seem to us to be illogical.  If the act is to be held to be invalid because of an inspection of the journals, it must be because the journals are the highest and best evidence of what the legislature did, by virtue of their customary keeping, or because of some constitutional provision requiring them to be kept. If they are in fact the constitutional evidence of what was done and what was not done, and are final and conclusive in their nature, it would seem that silence in regard to a step required to be taken by the constitution would be equivalent to negation.   It is improbable that a journal ever contains such an entry as that an act was passed, but was not read as a constitutional provision required, or was not published, or read three times, or the like.   So that if the journal must show what the legislature did and is the conclusive evidence of it, it is difficult to see why an absence of showing a required step is not equivalent to a denial that such step was taken. Silence of the ultimate witness as to requisites which must be shown is apparently equivalent to negative assertion.  Cases of the class now referred to condone omissions of the journals to show compliance with requirements, and cure them by the aid of presumptions that something happened which the journals do not show, but upset the act and declare it invalid when the journals do speak.   In other words, they are final as to what happened, but practically of no weight as to what did not happen.

Taking up the two great divisions of adjudication, one of which goes behind the enrolled act, duly signed, approved, and deposited, and invalidates it by inspecting the journals, and the other of which holds the enrolled act, thus signed, approved, and deposited, to be conclusive, at least unless some constitutional provision distinctly declares otherwise, we will mention a few of the many adjudications.   At the outset, however, let it be borne in mind that there is a wide distinction between taking up an act which has been passed by the legislature, comparing it with the constitution,

and declaring whether its provisions are in accord with that instrument or not, and looking into the details of the method of procedure by the legislative bodies in passing the act and the regularity of the steps which they took in so doing. The court declares the law. If there are two statutes in apparent conflict, the court must determine which is the controlling one, or the existing law. If a statute and a provision of the constitution are set up as being in conflict with each other, the court must compare the two and determine if such a conflict in fact exists, and, if so, that the constitution must prevail. But this is not the same thing as going into the details of legislative procedure, critically examining the methods of a co-ordinate department of the government, and declaring that its members have failed or refused to obey constitutional directions or commands as to the manner in which they should perform their duties, because of an entry, or the absence of an entry, on the journal kept by some clerk or subordinate employee. The latter proceeding is at best a matter of delicacy, and not to be indulged in by the courts unless plainly required by the constitution. The legislature is one of the three departments of the government. Its members and officers are sworn to support the constitution; and in the discharge of their duties they are acting under oath. Where the constitution directs or commands them to take certain steps in a certain way, or not to enact a law without some prescribed antecedent procedure, their oath includes the obligation to enact the measure in the constitutional manner, or not to enact it without the happening of the constitutional event thus provided. In the imperfection of all human institutions, legislatures may sometimes, through inadvertence or even through design, violate the constitution, but the courts will not lightly conclude that they have intentionally or unintentionally violated rules of conduct laid down for them by the constitution in the transaction of their business. The clerical officials who keep the legislative journals must necessarily do so in the haste and pressure of business; and memoranda, often hurriedly made, must be relied on by them. Assistants and subordinates are employed to aid them. As between the question of whether the president of the Senate and the speaker of the House, aided by the enrollment committees, all of whom are charged with the duty of seeing that the constitutional rules are enforced, have, through incompetence or corruption, violated that

duty and signed and sent to the Governor an act which had not in fact been passed in the constitutional manner, and that the Governor, who is also sworn to obey the constitution, has likewise inadvertently or unintentionally approved an act which had not been lawfully passed, or, on the other hand, that some journalizing clerk or assistant has made a mistake in the preparation of the journal, courts will be more ready to adopt the latter theory than the former. Const. art. 3, sec. 7, pars. 13, 23. We do not mean that correct entries should not be made. It is the duty of the secretary of the Senate and the clerk of the House of Representatives to have correct entries made, so that the journals shall truly show the history of the transactions of the legislature and of each bill introduced; and there are journalizing committees charged with a similar duty. The journals are deposited, after completion, with the secretary of State. There is no law by which mistakes in them can be then corrected. It would be unfortunate, indeed, if an accidental error by the clerk, beyond correction, must be seized on by the courts to destroy the act, unless it is clearly so required.

In England the signed and enrolled act has uniformly been held to be conclusive. Rex *v.* Arundel, Hobart, 110; The Case of Heresy, 12 Coke, 57, 58; College of Physicians' Case, 3 Keb. 587; Edinburg Ry. Co. *v.* Wauchope, 8 Cl. & F. 710, 724. While the English constitution is unwritten, it is not without existence, and in the conservatism of that country long continued custom has sometimes been adhered to as closely as written declarations in enactments in other countries. In America the United States and each of the individual states has a written constitution, most, if not all, of which contemplate the keeping of journals by the respective legislative bodies. One of the leading cases discussing the relative weight to be given to the enrolled act and the entries on the journals, for the purpose of invalidating it, is that of Field *v.* Clark, 143 U. S. 649 (12 Sup. Ct. 495, 36 L. ed. 284). It was there held: "The signing by the Speaker of the House of Representatives and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two Houses of such bill as one that has passed Congress; and when the bill thus attested receives the approval of the President, and is deposited in the Department of State according to law, its authentication as a bill that has passed Congress is complete and unimpeachable. It is not com-

petent to show from the journals of either House of Congress that an act so authenticated, approved, and deposited did not pass in the precise form in which it was signed by the presiding officers of the two Houses and approved by the President." The constitution of the United States is not identical with that of the State of Georgia on the subject of the method of passing acts, but it does declare that "Each house shall keep a journal of its proceedings and from time to time publish the same, excepting such parts as may in their judgment require secrecy; and the yeas and nays of the members of either house on any question shall, at the desire of one fifth of those present, be entered on the journal." Art. 1, sec. 5. It does not require the president of the Senate and the speaker of the House to attest the bill in the presence of the respective houses. In the case cited, it was contended that a tariff act, which had been signed by the presiding officer of each house and approved by the President and deposited with the secretary of State, was invalid because it had omitted entirely a section which was contained in the act as passed by the two houses, and that this could be shown by reference to the journals of those bodies, reports of committees of conference, and other papers printed by authority of Congress, and having reference to the bill in question. While the court said that as to matters which the constitution expressly required to be entered on the journals it was unnecessary to enter into a discussion, as that question was not involved, yet the reasoning of the court is cogent. Mr. Justice Harlan, among other things, said: "It was assumed in argument that the object of this clause was to make the journal the best, if not conclusive, evidence upon the issue as to whether a bill was in fact passed by the two houses of Congress. But the words used do not require such interpretation. On the contrary, as Mr. Justice Story has well said, 'the object of the whole clause is to insure publicity to the proceedings of the legislature, and a correspondent responsibility of the members to their respective constituents. And it is founded in sound policy and deep political foresight. Intrigue and cabal are thus deprived of some of their main resources, by plotting and devising measures in secrecy. The public mind is enlightened by an attentive examination of the public measures; patriotism and integrity and wisdom obtain their due reward; and votes are ascertained, not by vague conjecture, but by positive facts. . . So long as known

and open responsibility is valuable as a check or an incentive among the representatives of a free people, so long a journal of their proceedings and their votes, published in the face of the world, will continue to enjoy public favor and be demanded by public opinion.' 1 Story, Constitution, §§ 840, 841. . . It is admitted that an enrolled act, thus authenticated, is sufficient evidence of itself— nothing to the contrary appearing upon its face—that it passed Congress. But the contention is, that it can not be regarded as a law of the United States if the journal of either house fails to show that it passed in the precise form in which it was signed by the presiding officers of the two houses, and approved by the President. It is said that, under any other view, it becomes possible for the Speaker of the House of Representatives and the President of the Senate to impose upon the people as a law a bill that was never passed by Congress. But this possibility is too remote to be seriously considered in the present inquiry. It suggests a deliberate conspiracy to which the presiding officers, the committee on enrolled bills, and the clerks of the two houses must necessarily be parties, all acting with a common purpose to defeat an expression of the popular will in the mode prescribed by the Constitution. Judicial action based upon such a suggestion is forbidden by the respect due to a co-ordinate branch of the government. The evils that may result from the recognition of the principle that an enrolled act, in the custody of the Secretary of State, attested by the signatures of the presiding officers of the two houses of Congress, and the approval of the President, is conclusive evidence that it was passed by Congress, according to the forms of the Constitution, would be far less than those that would certainly result from a rule making the validity of Congressional enactments depend upon the manner in which the journals of the respective houses are kept by the subordinate officers charged with the duty of keeping them." Attached to the brief of the attorneys for the government in that case, and printed on pages 661 et seq., is a list of authorities up to that time (1891), by States, upon the question whether the legislative journals could be used to impeach the enrolled act, duly recorded and authenticated; and some of the leading decisions were discussed in the opinion of Mr. Justice Harlan. Since the decision of that case several of the courts have changed their position on the subject, and have abandoned the practice of holding duly signed

and enrolled acts invalid because of entries and omissions in the journals. Thus, in the Bond Debt Cases, 12 S. C. 200, the journals were considered, but in State ex rel. Groeschel v. Chester, 39 S. C. 307 (17 S. E. 752), it was held: "Where an original bill and an act duly ratified and approved show on their face that the bill originated in the House of Representatives, received three readings in both houses, and the act was duly signed by the president of the Senate and the speaker of the House of Representatives, and approved and signed by the Governor, and deposited with the secretary of State, the court can not look to the journals of the two houses to show that the bill did not originate in the lower house, did not receive three readings in both houses and was not duly ratified, the true rule being that such an act is sufficient evidence that it passed the General Assembly, and it is not competent to impeach such an act by the journals of the houses, or any other evidence, other than evidence of such prerequisites as the organization of the houses, the presence of a quorum, and the record of votes upon the journals when so required by the constitution." Some previous rulings on the subject were formally overruled.

In Indiana some of the earlier decisions followed the doctrine of holding acts invalid by references to the journals; but in Evans v. Browne, 30 Ind. 514 (95 Am. D. 710), the court reversed its position and followed the rule later announced in Field v. Clark. Frazer, J., said that it was believed that the anomalous and essentially mischievous doctrine of thus upsetting acts had its origin in New York, and had passed into other States and been adopted without much examination, though afterwards largely exploded in the State of its origin. In Kentucky it was first apparently thought that the enrolled bill might be attacked by considering the journals. The constitution of that State (sec. 46) declares, that "No bill shall become a law unless, on its final passage, it receives the votes of at least two fifths of the members elected to each house, and a majority of the members voting, the vote to be taken by yeas and nays and entered on the journal." In Lafferty v. Huffman, 99 Ky. 80 (35 S. W. 123, 32 L. R. A. 203), upon full consideration, that position was repudiated. It was said the argument in a former decision was not decisive of the point, and it was held: "An enrolled bill, when attested by the presiding officers of the two Houses of the General Assembly, as required by law, can

not be impeached by the journals of those Houses, and must be accepted by the courts as the bill adopted by the legislature and as conclusive of the regularity of the steps taken in its passage." Hazelrigg, J., referring to the decisions which hold that the journals are competent to impeach the enrolled bill, but which declare that where those records are merely silent the presumption is absolute that the required steps were in fact taken, said: "This seems to us hardly logical.    If the validity of a law is to rest at all on the entries in the journals, it seems to us when there is a total absence of evidence that a necessary step has been taken, the super-structure—the law—thus built up without a foundation must fall. Those courts assume that the failure of the clerk to make the entry and in this violate the constitution requiring the entry to be made was an oversight or mistake, and treat the entry as made, sup-plying the omission; and yet are not willing to assume it to be a mistake or mere misapprehension of the inferior officer if an entry is made showing steps taken not in conformity with the constitu-tional requirements."    Again, he said: "But it is said, since the constitution requires the journals to be kept, it must be because they are to be used as evidence of legislative compliance or non-compliance with the constitutional requirements.    We can see, however, much use for these journals other than the one sug-gested.    Besides being necessary for the conduct of the business, it is to be remembered that our government is a representative one, and the journals show the respective parts borne by each represen-tative in the enactment of the laws and the conduct of the public business.    Responsibility can not be shifted or made to rest on the body as a whole.    We know that the enrollment of bills receives careful attention at the hands of special committees for that pur-pose.    It is the final act of the body, the climax of the work before the finishing hand of the presiding officer sets his approval thereto. It receives and merits attention for that reason, and there is small room for imposition or fraud.    The enrolled act is well-nigh neces-sarily the very act passed by the body, but the chances of mistake are very great in the make-up of the journals, as they are ordi-narily kept; and if it be understood that the enrolled bill may be impeached by them, the chances of fraud are likewise great."    The constitution of Washington of 1891 (art. 2, sec. 22) contains this provision: "No bill shall become a law unless on its final passage

the vote be taken by yeas and nays, the names of the members voting for or against the same be entered on the journal of each house, and the majority of the members elected to each house be recorded thereon as voting in its favor." Nevertheless, in State ex rel. Reed v. Jones, 6 Wash. 452 (34 Pac. 201, 23 L. R. A. 340), it was held: "The enrolled bill on file in the office of secretary of State of an act of the legislature, which is duly signed by the presiding officers of both houses, and otherwise appears fair upon its face, is conclusive evidence of the regularity of all proceedings necessary for its proper enactment in conformity with the constitutional provisions." In the opinion it was said: "Unless the method of keeping journals should at once be revolutionized, and so much attention be paid to them that they will be made to absolutely represent all the doings of the body to such an extent as to very much prolong the sessions of the legislature, the sanctity of legislative enactments will be entirely dependent upon the carefulness and good faith of some copyist employed by the legislature at a few dollars per day." The authorities on the subject were elaborately discussed.

In California a full discussion of the subject was had in Sherman v. Story, 30 Cal. 253 (89 Am. D. 93), where it was held that the enrolled act could not be impeached by the journals. In 1879 a new constitution was adopted in that State, which provided (art. 4, sec. 15) that on the final passage of all bills they should be read at length and the vote should be by yeas and nays on each bill separately, and should be entered on the journals, and no bill should become a law without the concurrence of a majority of the members elected to each house. Nevertheless, in Yolo County v. Coghlan, 132 Cal. 265 (64 Pac. 403, 84 Am. St. R. 41), the court held that the validity of a statute, which had been duly certified, enrolled, approved, and deposited in the office of the secretary of State, could not be impeached by a resort to the journals of the legislature; and this has been followed in later cases.

One of the earlier and leading cases on the subject is that of Pangborn v. Young, 32 N. J. L. 29, in which Chief Justice Beasley filed a forcible opinion, considering the question and holding that the enrolled act, duly signed and filed in the office of the secretary of State, or an exemplification of it under the great seal, was conclusive evidence of its existence and contents, and that the minutes of the two houses, although kept under the requirements of the

constitution, could not be received as evidence for the purpose of showing that the law as actually voted on and passed, and approved by the Governor, was variant from that filed in the office of the secretary of State. He declared that this view was in conformity with the decided weight of American authority. It was stated that the constitution provided that "each house shall keep a journal of its proceedings, and from time to time publish the same; and the yeas and nays of the members of either house on any question shall, at the desire of one fifth of those present, be entered on the journal;" and that another clause directed, with regard to the form of enacting bills, "that the yeas and nays of the members voting on such final passage shall be entered on the journal." In the opinion it was said: "Can any one deny that, if the laws of the State are to be tested by a comparison with these journals, so imperfect, so unauthenticated, that the stability of all written law will be shaken to its very foundations? Certainly no person can venture to say that many of our statutes, perhaps some of the oldest and most important, those which affect large classes of persons, or on which great interests depend, will be found defective, even in constitutional particulars, if judged by this criterion." Referring to the argument that, unless the courts were permitted to examine the journals to see if the legislature was following the constitutional provisions in regard to the manner of enacting laws, the legislature might, at will, set at defiance the restraints of the organic law, the Chief Justice said: "If we may be permitted, for the purpose of illustration, to suppose the legislature to design the enactment of a law in violation of the principles of the constitution, a judicial authority to inspect the journals of that body would interpose not the slightest barrier against such transgression, for it is obvious that there could not be the least difficulty in withholding from such journals every fact evincive of such transgression. A journal can be no check on the actions of those who keep it, when a violation of duty is intentional. It can not, therefore, fail to be observed how inadequate to the correction of the supposed evil is the proposed remedy." Again, he said: "If an enrolled statute of this State does not carry within itself conclusive evidence of its own authenticity, it would seem that the same principle must be extended to the statutes, however authenticated, of other States. An act, therefore, of Virginia or California, with regard to the

mode of its enactment, would be open to trial as a matter in pais. And, indeed, the doctrine, if carried to its legitimate conclusion, would seem to abolish altogether the conclusiveness even of international authentications; for if the great seal of this State, attesting the existence of a statute, is not final, it is not perceived how a greater efficacy is to be given to the seal of a foreign government." In Ex Parte Wren, 63 Miss. 512, 532 (56 Am. R. 825), Mr. Justice Campbell said: "If the validity of every act published as law is to be tested by examining its history, as shown by the journals of the two houses of the legislature, there will be an amount of litigation, difficulty, and painful uncertainty appalling in its contemplation and multiplying a hundredfold the alleged uncertainty of the law. Every suit before every court where the validity of a statute may be called in question as affecting the right of a litigant will be in the nature of an appeal or writ of error or bill of review for errors apparent on the face of the legislative records, and the journals must be explored to determine if some contradiction does not exist between the journals and the bill signed by the presiding officers of the two houses.   What is the law is to be declared by the court. It must inform itself as best it can what is the law.   If it may go beyond the enrolled and signed bill and try its validity by the record contained in the journals, it must perform this task as often as called on, and every court must do it.   A justice of the peace must do it, for he has as much right and is as much bound to preserve the constitution and declare and apply the law as any other court, and we will have the spectacle of examination of journals by justices of the peace and statutes declared to be not law as the result of their journalistic history, and the circuit and chancery courts will be constantly engaged in like manner, and this court will, on appeal, have often to try the correctness of the determination of the court below as to the conclusion to be drawn from the legislative journals on the inquiry as to the validity of statutes thus tested."   In a note by Mr. A. C. Freeman to the case of Carr v. Coke, 47 Am. St. R. 801, 815 (116 N. C. 223, 22 S. E. 16, 28 L. R. A. 737), it is stated that "The current of the later and better reasoned authorities is unhesitatingly in favor of the doctrine that a duly enrolled and authenticated statute regular on its face is conclusive of the fact that it was regularly passed, and that the courts can not go behind it and entertain evidence by which it may be

48

impeached. Wherever the question is one of first impression, this rule is generally adopted, while in some other States the courts continue to follow earlier precedent, and adhere to the contrary view."

It would unduly prolong this opinion to take up the constitutional provisions of each State and the rulings made under them. Most of the decisions will be found classified in a note to Palatine Insurance Co. v. Northern Pacific Railway Co., 9 Am. & Eng. Ann. Cases, 582 (34 Mont. 268, 85 Pac. 1032). See also 26 Am. & Eng. Enc. Law, 556 et seq., and cases cited. In a number of the States it has been held that the legislative journals can be considered. The decisions rendered by the Supreme Court of Illinois, beginning with that in Spangler v. Jacoby, 14 Ill. 297 (58 Am. D. 571), are typical of this class. In some of the States particular words in a constitution have been construed one way, as bearing on the subject now in hand, while substantially the same words have been construed in a different way in other jurisdictions. Thus, the words, "to be entered on the journal of each house," are construed as mandatory in Florida (State v. Green, 36 Fla. 154 (18 So. 334)), while the words, "to be noted on the journal," are construed in Tennessee as directory merely (Home Telegraph Co. v. Mayor etc. of Nashville, 118 Tenn. 1 (101 S. W. 770)). In North Carolina the constitution provides (art. 2, sec. 14) : "No law shall be passed to raise money on the credit of the State, . . unless the bill for the purpose shall have been read three several times in each house of the General Assembly, and passed three several readings, which readings shall be on three different days, and agreed to by each house respectively, and unless the yeas and nays on the second and third readings of the bill shall have been entered on the journal." It was held, in Bank v. Commissioners, 119. N. C. 214 (25 S. E. 966, 34 L. R. A. 487), that the validity of an act could be impeached by reference to the journals. But compare what was said in Carr v. Coke, 116 N. C. 223 (22 S. E. 16, 28 L. R. A. 737, 47 Am. St. R. 801), and what was said in State v. Jones, 6 Wash. supra, under the provision of the constitution of that State. It would be fruitless to enter into an elaborate discussion of the peculiar language employed in some of the State constitutions and the rulings made in regard to it. It may be stated, generally, that unless the constitution, in effect, establishes a standard by which the courts are to measure the validity of the legislative procedure, they

will not go behind the enrolled act, duly signed and filed in the proper depository. Some of the courts treat the direction or mandate of the constitution as to the methods of procedure as directed to the legislature; some, under the special language of a particular provision, as furnishing a guide for the courts. We need not determine what would be the ruling under a stringent provision similar to that contained in the North Carolina constitution, as, for example, the constitutional statement contained in § 5775 of our Civil Code, that no bill or resolution appropriating money shall become a law unless upon its passage the yeas and nays, in each house, are recorded.

In the present case it is contended that the act in question is invalid, because the journal of the House of Representatives does not show that the constitutional provision embodied in the Civil Code, § 5777, was complied with. That section is as follows: "No bill shall become a law unless it shall receive a majority of the votes of all the members elected to each house of the General Assembly, and it shall, in every instance, so appear on the journal." The language here employed is different from that contained in section 5775. The section now involved declares that no bill shall become a law unless it receives a majority of the votes of all the members elected to each house, but does not add, "and also unless it shall so appear on the journal," but, after the first provision, it adds the command or direction that it shall so appear. Therefore, whatever might be held in regard to an appropriation act, the present law clearly comes within the reasoning and authority of the weight of judicial decisions above discussed. Neither are we dealing with what may be the requirements as to amendments proposed to the constitution; which, strictly speaking, are not acts of the legislature in the ordinary acceptation of these words, but proposals of amendments.

There has been no ruling in this State directly upon the question of declaring an act invalid by reference to the journals, in regard to the steps to be taken in its passage. There are some expressions employed in different opinions which might imply that the journals could be looked to for that purpose, but they were not direct rulings. Thus, in Speer v. Athens, 85 Ga. 49 (11 S. E. 802, 9 L. R. A. 402), the validity of a local act was involved, it being contended that no notice of its intended introduction had been given as re-

quired by the constitution. Extrinsic evidence was offered to show that the necessary publication had not been made. This court held that the act could not be so impeached, and that whether proper notice had been given for the introduction of a local or special bill was for the decision of the legislature. It was said that evidence in regard thereto "outside of the journals" could not be received, but the case did not involve the question whether the act could be shown to be invalid by reference to the journals. In later rulings the language in regard to evidence "outside of the journals" has been omitted. *White* v. *Atlanta*, 134 *Ga.* 532 (68 S. E. 103). In *Lee* v. *Tucker*, 130 *Ga.* 43 (60 S. E. 164), the question arose on a proceeding to remove a county-site, where there was an election followed by an act of the legislature. On page 49 it was said: "If, in Georgia, the courts have any such power to pass upon such a question of fact, it is at least clear from the rulings heretofore cited that they can consider no evidence outside of the journals of the two houses of the General Assembly," thus expressing a doubt as to the power of the courts to pass upon the question of fact at all. In *Carswell* v. *Wright*, 133 *Ga.* 714 (66 S. E. 905), no point was made as to the right to consider the journals, but only as to the construction of certain entries thereon. In *Georgia Penitentiary Co.* v. *Nelms*, 65 *Ga.* 499 (38 Am. R. 793), an attack was made on an act or resolution on the ground that it gave a donation or gratuity, and that the journals did not show that it passed by a two-thirds vote and that the yeas and nays were recorded. The actual ruling was that the act or resolution in question did not give a donation or gratuity; and that whatever were the requirements of the constitution on that subject, they had no application to the case in hand. Without citing all of the cases in this State on the subject, it may be said that in none of them has it been directly held that an act of the legislature, duly enrolled and signed, approved by the Governor, and deposited in the office of the secretary of State, could be shown to be invalid by reason of entries or lack of entries on the journals touching the details of its passage, such as whether it was duly published, if a local act, or was read on three separate days in each house, or what was the vote on its passage.

It is said that the constitution provides for the keeping of journals, which shall be deposited with the secretary of State and pub-

lished, and that the legislature has provided, in the Civil Code, § 5210, that the journals of each branch of the General Assembly, as published, shall be recognized judicially without proof; and the inquiry is made, for what purpose can they be used, if not to show non-compliance by the legislature with the constitutional provisions in regard to reading and passing bills? Certain useful functions of the journals and their publication have already been noted, as suggested by Judge Story and the Supreme Court of Kentucky. In addition to these, other uses might be suggested; for instance, it might be desirable to consult them to ascertain who were the presiding officers of the respective houses; or if it should be shown that a certain event happened during the session of the legislature in a particular year, the journals might show when the legislature was in session that year. A possible use for them might arise on the construction of an act. In *Solomon* v. *Commissioners of Cartersville,* 41 *Ga.* 157, the journals of the General Assembly were consulted to ascertain when the legislature adjourned. In *Gormley* v. *Taylor,* 44 *Ga.* 76, a query was put on this subject. Apparently, however, the journals were consulted as to certain sessions held by the General Assembly. The court said: "When important and almost revolutionary results must flow from declaring a session of the legislature illegal, the courts are bound to require a most palpable and direct violation of the constitution before they interfere." See also, *McDaniel* v. *Strohecker,* 19 *Ga.* 432, 435; *Bibb County Loan Association* v. *Richards,* 21 *Ga.* 592, 613-616; *Cutcher* v. *Crawford,* 105 *Ga.* 180 (31 S. E. 139). While the mere consequence of declaring a plainly unconstitutional act to be so can not affect the adjudication, yet if the far-reaching consequences of scrutinizing the conduct of the legislature in respect of passing acts may legitimately be considered by the courts in determining the constitutional purpose on that subject, it may be mentioned that there are now pending before this court four cases in which attacks have been made upon the validity of acts of the legislature on the ground of irregularity, or failure to strictly pursue the constitutional provisions in regard to their passage. The case now under consideration involves the entire system of county and district schools and local taxation for educational purposes. Another act thus attacked is what is commonly known as the prohibition law, prohibiting the manufacture or sale of intoxicating

liquors in this State, etc.   With the fall of this act would probably go the taxation on substitutes for spirituous or malt liquors.   Still another of the cases involves the method of passing an act increasing the salaries of certain judges of superior courts and city courts. Still another involves the legislative proceedings in passing an act requiring headlights of a certain character on locomotives.   These cases alone involve most important consequences.   If the rule sought to be established should be laid down, by which the courts would scrutinize the legislative journals for years past and declare invalid all acts in regard to which such journals do not show compliance with the methods prescribed by the constitution, it is difficult to see how far-reaching the results might be.

There were some other points mentioned in the petition, but not referred to in the briefs.   Upon a careful consideration, we are of opinion that the act now in question should not be declared invalid for the reason urged against it.

For the reasons stated, we are of opinion that the judgment complained of should be affirmed.

*Judgment affirmed.   All the Justices concur.*